**STATE of Maine et al.**

v.

**The FIN & FEATHER CLUB et al.**

Supreme Judicial Court of Maine.

Feb. 21, 1974.

John W. Benoit, Jr., Deputy Atty. Gen., Augusta, for plaintiff.

Doyle & Fuller by Jon R. Doyle, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

This case is on report from the Superior Court (Kennebec County) in an action seeking a declaration of the rights of parties under leases to real property owned by the State of Maine and located in Baxter State Park.[1] The defendants claim that the State lacks the authority under the relevant leases to effect a termination of their leasehold rights in such property.

The relative rights of the parties to this action may best be understood by briefly tracing the history of the leases and the creation of the lessor-lessee relationship. In 1956 and 1958, the defendants leased the subject property from the Great Northern Paper Company, the then owner of the land. The terms of those leases extended from year to year with the right of either party to cancel. The Fin & Feather Club lease required a thirty-day notice period prior to the termination date, and the Budreau-McQuarrie-Morrow lease required notice of cancellation to be given on a rent day.

On May 11, 1962, the Great Northern Paper Company conveyed by deed real estate, including realty covered by the above leases, to Percival P. Baxter. The quitclaim deed was made subject to the existing camp leases; "so long as said lessess [sic] use said leased premises for the purposes as now established, each of said lessees may continue its and his occupation under said lease in accordance with the terms thereof."

On August 6, 1962, Percival P. Baxter executed a deed granting the subject real estate to the State of Maine in trust for the benefit of the people of Maine. This conveyance was also made subject to the outstanding leases with the same exact language as that contained in the previous deed from Great Northern Paper Company to Percival P. Baxter.

In a Resolve of the Governor of the State of Maine and Executive Council dated September 5, 1962, the gift of the land in trust was accepted; and that was ratified and confirmed by the 101st Legislature of the State of Maine by its enactment of Chapter 1 of the Private and Special Laws of 1963.

In June and December of 1963, leases were executed by Austin H. Wilkins in his capacity as Chairman of the Baxter State Park Authority to the defendants for the property they had been holding under the prior leases. Defendants signed these leases accordingly. The defendants have made and the Baxter State Park Authority has accepted rental payments under these leases for the years 1963 through 1971.

By letters dated December 19, 1969, the Chairman of the Baxter State Park Authority notified the defendants that their leases were not to be renewed at the close of 1970. The defendants refused to quit the leased premises, and while the parties were preparing to test the matter in court, the Park Authority repeated its notice of termination in letters dated December 8, 1971 and January 10, 1972.

There is dispute as to which of the two sets of leases was operative at the time of the termination notice. The defendants in this action contend that the State lacks the power to terminate the leaseholds whether the original lease from Great Northern or the later lease from the Park Authority was then in effect.

Although the original lease from Great Northern contained the right of termination by the lessor upon notice, the defendants maintain that the termination right was not included in the transfer by deed to Governor Baxter. In support of this posi-

---

1. Named after its prime benefactor, Percival Proctor Baxter, Governor of the State of Maine, January 31, 1921 through January 7, 1925.

tion, defendants point out a paragraph in the Great Northern-Baxter deed of May 11, 1962, which states:

> "This conveyance is made subject to three existing camp leases, viz: (A) Lease on north shore of Abol Stream at outlet of Abol Pond to the Fin and Feather Club; (B) Lease on shore of Abol Pond to Abol Pond Scout Camp Committee; and (C) Lease on Togue Stream to Ronald Budreau, et als; so long as said lessess [sic] use said leased premises for the purposes as now established, each of said lessees may continue its and his occupation under said lease in accordance with the terms thereof."

Defendants interpret this language as a reservation and qualification of the reversionary interests which Great Northern deeded to Governor Baxter, such interests thereby not including the termination powers contained in the original lease. This interpretation would grant to defendants an absolute right to occupy the premises until they ceased to use the leased land as it was used at the making of the deed or until they breached the conditions of their leases. This Court finds such an interpretation improper relative to the law and facts of this case.

■■■ The purchaser of a parcel of property takes subject to a lease thereof where he has actual notice of the lease or constructive notice through the recordation of the lease. A purchaser without notice of an unrecorded lease, which is within the recording law, may be held not bound by such a lease. *See* 1 American Law of Property § 3.59 (A. J. Casner ed. 1952); 51C C.J.S. Landlord & Tenant § 258(2).

■■■ There is no evidence in the present case that the original lease was recorded. Therefore, the "subject to" clause in the deed from Great Northern to Baxter served to provide actual notice of the outstanding leases. Anderson v. Conner, 43 Misc. 384, 87 N.Y.S. 449, 451 (1904).

Such notice protected the lessees from divestment of their interests in the land, and also protected Great Northern from any claim of breach of its warranty against "lawful claims and demands of all persons claiming by, through or under the Grantor herein." McRae v. Pope, 311 Mass. 500, 42 N.E.2d 261, 264 (1942). The "subject to" clause served to describe accurately the specific reversionary interests being transferred from Great Northern to Baxter. Harley v. Magnolia Petroleum Co., 378 Ill. 19, 37 N.E.2d 760, 766 (1941); Cockrell v. Texas Gulf Sulphur Co., 157 Tex. 10, 299 S.W.2d 672, 676 (1956). The inclusion of additional language in the "subject to" clause, stating that the lessees may continue their occupation in accordance with the leases, did nothing to change the effect of the clause. It merely confirmed the continuing rights of the tenants *under the original lease*. It is in this original lease that the rights of the lessees and transferee-lessor were laid out. Nothing in the deed from Great Northern Paper Company to Governor Baxter expanded the leasehold rights of the third party lessees. Nor did the qualifying phrase "subject to" connote a reservation or retention of property rights by Great Northern. Renner v. Crisman, 80 S.D. 532, 127 N.W.2d 717, 721 (1964).

■■■ Unless expressly excepted, title also passes, without description or mention, to all appurtenances and incidents belonging to it. These rights include the grantor's interest as lessor in a lease. *See* 3 American Law of Property § 12.87. In the subject transfer, Governor Baxter obtained all rights of the Great Northern Paper Company relative to the leases with the defendants. These rights included that of termination upon proper notice.

Similarly, the conveyance of the property from Governor Baxter to the State of Maine transferred the same rights relative to the outstanding leases. The State had the full rights of the lessor under the original lease agreements.

Subsequent to the conveyance of the reversionary interests in the property from Governor Baxter to the State of Maine, new leases were executed between the State (by the Baxter State Park Authority) and the defendants for the subject property. The creation in 1963 of these new leases gives rise to three important issues: (1) the authority of the Baxter State Park Authority to lease lands in Baxter State Park, (2) the effect of the new leases on the prior leases between the parties, (3) the rights of the parties under the new leases.

I

The land constituting Baxter State Park is,

" . . . under the joint supervision and control of, and shall be administered by the Forest Commissioner, the Commissioner of Inland Fisheries and Game and the Attorney General, and the said commissioners and Attorney General *shall have full power in the control and management of the same,* under the title of Baxter State Park Authority." 12 M.R.S.A. § 901. (Emphasis added.)

Public bodies may exercise only that power which is conferred upon them by law. The source of that authority must be found in the empowering statute, which grants not only the expressly delegated powers, but also incidental powers necessary to the full exercise of those invested. This Court has so found relative to the regulatory authority of the Public Utilities Commission. City of Rockland v. Camden and Rockland Water Co., 134 Me. 95, 181 A. 818 (1935). An authorizing statute grants such powers as may be fairly implied from its language. These powers are:

1. those necessarily arising from powers expressly granted

2. those reasonably inferred from powers expressly granted

3. those essential to give effect to powers expressly granted.

The public body may employ means appropriate for the purpose of carrying out the authority directly conferred upon it. Lynch v. Commissioner of Education, 317 Mass. 73, 56 N.E.2d 896 (1944) (statute conferring "general management" of institution upon state department confers authority to deal with all details of control and administration of such institution). *See* also, 2 McQuillin Mun.Corp. (3rd Ed.) § 10.12., 67 C.J.S. Officers § 107.

The grant of power to the Park Authority in § 901 for the management and control of Baxter State Park is broad and greatly dependent on the discretion of the Park Authority members. In determining the parameters of permissible action, this Court is mindful of Governor Baxter's intent

" . . . not to separate this park from the people to whom it was given; but rather seek to have it enjoyed and 'used to the fullest extent but in the right unspoiled manner.' "

This expression of intent is now incorporated into our law under 12 M.R.S.A. § 900. There may be no doubt that the land is to be kept as a " . . . public park and place of recreation" in its "natural wild state." *Id.*

The administration of Baxter State Park was specifically exempted from any supervision or connection with the State Park Commission. *Id.* The statute contemplates the terms of the donor's trust being most effectively accomplished by giving broad powers of control to three State officers, who would be exclusively responsible for seeing that the terms of the trust are strictly satisfied. 12 M.R.S.A. §§ 901, 906.

It is in this light that we consider the granting of new leases by the Park Authority to the defendants in 1963 in substitution for the prior leases granted by Great Northern Paper Company. The new leases specifically and clearly restricted the rights of the lessees in the use of the land,

so as to comport with Percival P. Baxter's intention that the land remain in its natural state. These restrictions pertained to clearing the land, kindling fires, use of firearms and habitation of the buildings. Some of these restrictions were not contained in the earlier leases. The new leases increased the ability of the lessor-Park Authority to manage and control the leased land consistent with their statutory duties and trust obligations.

Nothing in the instrument creating the trust or in the statutory provision specifically precluded the Park Authority from continuing in a lessor relationship with the defendants. 12 M.R.S.A. § 906 contains specific restrictions on powers and duties of the Park Authority but contains no admonishment relative to leases. Furthermore Governor Baxter transferred the property in trust to the State with leases to the defendants outstanding, though he could have exercised his termination rights.

It is acknolwedged that the park was to be used for "public recreational purposes." Nothing in the Park Authority action was inconsistent with that goal. The new leases were executed shortly after the State's acquisition of the lands. No public purpose would have been served by the immediate expulsion of all tenants occupying the land. Such action would have maximized disruption of the tenants' plans and been of little benefit to the increased utilization of park land. Instead, the Park Authority executed new leases that assured effective land use management of the park property. This approach allowed the continuation of non-conflicting land use during the period that the Park Authority consolidated its lands and developed plans for the public usage of the area.

■■■■ The grant of authority to the members of the Baxter State Park Author-

ity is broad with emphasis on the goals of management rather than the methods. A general grant of power, unaccompanied by definite directions as to how the power is to be exercised, implies the right to employ means and methods necessary to comply with statutory requirements. Gemsco v. Walling, 324 U.S. 244, 262, 65 S.Ct. 605, 615, 89 L.Ed. 921 (1945); United States v. Jones, 204 F.2d 745 (7th Cir. 1953), cert. denied 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368 (1953).[2] The action of the Park Authority, in substituting new leases more favorable to the State's supervision of land use, was a limited managerial act consistent with the broad delegation of power authorized by statute and trust instrument. The courts will not review managerial acts, not clearly arbitrary, of executive officials performed within the scope of their authority and will not substitute their judgment in such matters for that of the officials.

## II

■■■■ Concluding that the Baxter State Park Authority was properly authorized to negotiate new leases with the defendants, we hold that the acceptance by the tenant of a new lease for the same property from the lessor during the term of the original lease constituted a surrender by operation of law of the first lease. This Court similarly expressed this rule in the case of Brown v. Linn Woolen Co., 114 Me. 266, 269, 95 A. 1037, 1038 (1915):

"A surrender of a lease by act and operation of law is doubtless effected by acceptance by the tenant during the term of such lease of a new lease of the premises demised. Presumption of an intention to surrender follows such acceptance—'but if the acts of the parties taken all together, are such as to rebut

---

2. It is not necessary for us to discuss the general authority of the Baxter State Park Authority to lease park lands. The power exercised in the present case concerned a very limited exercise of discretion, in a situation where there were pre-existing leases on newly acquired park lands.

the idea of a surrender, then none ought to be presumed.' "

Nothing in the agreed statement indicates a contrary intent. The parties to the present action had originally been bound by leases that were not entered into directly between themselves. The action of the parties was consistent with the presumption of surrender, in that the new leases were indentures by and between the lessor and lessees and thereby might best express the contractual expectations and obligations of both. Nor are the new leases mere modifications of the prior leases. The new leases contain provisions more restrictive of the permissible land use by the tenants than the prior leases. They are also more specific as to the status of any structures erected on the properties. Much of the language of the new leases was drawn from the original leases. This very act of repetition lends substance to the new leases as being complete expressions of the leasehold agreements independent of any prior writings.

### III

It is in the new leases exclusively that we look to determine the terms of the leases and the relative rights of termination thereunder. The lease provisions are quite simple on this matter:

"To hold and enjoy the aforesaid premises and rights for the term from June 1, 1963 to January 1, 1964 and to continue from year to year from January 1st thereafter unless this lease is sooner ter-

minated under the provisions of this indenture."

The leases contain the added provision that any breach of the lease on the part of the lessees gives to the lessor an automatic right of termination without notice.[3]

It is argued by the defendants that these terms and termination provisions allow for annulment only upon the breach of one or more of the conditions set forth in the leases. This position reflects an inaccurate interpretation of the lease.

The parties agreed to a lease of seven months to continue from year to year thereafter. This created a lease for a fixed term to be followed by a periodic tenancy. A periodic tenancy is an estate that continues for successive periods unless terminated at the end of a period by notice. 1 Restatement, Property (1936) § 20. A year to year lease is such a periodic tenancy in the State of Maine. Moshier v. Reding, 12 Me. 478 (1835).

While it has been recognized that a "tenant from year to year . . . cannot be dispossessed without regular notice," *Id.* at 483, the length of time for notice of termination has not been established by statute or case law in this jurisdiction. The common law has long accepted a six months notice terminating with the end of a year. As far back as Right v. Darby, 1 Term R. 161, Lord Mansfield said in reference to year to year tenancies ". . . if either party should be inclined to change his mind, he should give the other half a

---

**3.** "If the lessees shall use said premises for any other purpose or in any other manner than as hereinbefore specified, or shall fail to pay the aforesaid rental when said rental becomes due, whether payment thereof be demanded or not, or shall fail to perform in good faith any of their agreements herein set forth, or to conform to all the restrictions herein stated, then and in any such case the lessor or its assigns may at its or their election enter without further notice or demand upon said premises and terminate and annul this lease so far as all further rights of the lessee hereunder are concerned, and repossess themselves of said premises and hold the same as in their First estate, together with all the buildings, erections and additions thereon, anything herein contained to the contrary notwithstanding; and no failure on the part of the lessor or its assigns to enforce a forfeiture of this lease for any breach by said lessee of any condition or agreement herein contained shall be construed as a waiver of the right to enforce a forfeiture for subsequent of the same or any other of said conditions or agreements."

year's notice before the expiration of the next or any following year." *See* cases cited in note to Stedman v. McIntosh, 42 Am.Dec. 126 (N.C.1844). The rule originated with respect to agricultural tenancies in order to allow tenants an opportunity to reap crops that they had sown, but with no apparent reason became firmly lodged in the common law as to other tenancies as well. Ellis v. Paige et al., in notis, 19 Mass. (2 Pick.) 71 (1823). The six month notice requirement is still employed by those jurisdictions looking to a common law source. 1 American Law of Property § 3.90; Maniatty v. Carroll Co., 114 Vt. 168, 41 A.2d 144 (1945); Johnson v. Selectmen of Salisbury, 120 Vt. 6, 132 A.2d 423 (1957). In the absence of legislative prescription in this area and any policy reasons to the contrary, this Court adopts the common law requirement that a year to year tenancy may be terminated upon six months notice with the end of the current year as the date of termination, unless otherwise provided by contract.[4]

▪ The plaintiff in this instance gave the requisite six month notice to the defendants. The issue presented to this Court is whether the phrase "to continue from year to year from January 1st thereafter *unless this lease is sooner terminated under the provisions of this indenture*

. . . ." (emphasis added) unilaterally restricted the ordinary termination rights of a lessor under a periodic tenancy. Defendants maintain that the language of the lease allows for termination only if the possible events contained in the "unless" clause actually occur, i. e. breach of a specific lease covenant.

This Court finds that the words of the "unless" clause neither were intended nor did they effect a restriction of the ordinary power of termination upon notice inherent to the landlord's rights under a periodic tenancy.[5] On the contrary, such language provides supplementary termination rights in the event that the tenant should be in violation of the terms of the lease. In that event, the six month notice provision is waived and the lessee consents to an automatic termination without further notice. The language of the clause makes the supplementary nature of the phrase evident. The inclusion of the word "sooner" in the phrase "unless this lease is sooner terminated under the provisions of this indenture" indicates an awareness and acceptance of a termination power vested in both the lessor and lessee that may take effect if the termination power for breach of the lease were not to arise.

▪ The phrase "to continue from year to year" establishes a periodic tenancy

---

4. The early cases of Gordan v. Gilman, 48 Me. 473 (1861) and Withers v. Larrabee, 48 Me. 570 (1861) refer to termination of "tenancies at will" when the rent was "payable yearly." The Court found that a three month notice of termination was required for all tenancies at will pursuant to the statute then in force, R.S. of 1841, c. 95, § 19. *See* now 14 M.R.S.A. § 6002 (30 days notice for tenancies at will). These were not, in fact, periodic tenancies but rather mere conferences of rights to the possession of leased premises for such indefinite period as both parties determined such possession was to continue. Rent was expressed in terms of yearly units but only for purposes of computing the payments during the uncertain term. The reason the tenancies could be no more than at will was due to the fact that the leasing agreements were oral. *See* now

33 M.R.S.A. § 162. These cases have no bearing on a case, such as the present one, where a periodic tenancy was created by written instrument. The difference in the treatment of year to year tenancies and tenancies at will as to notice of termination was recognized as early as 1835 in the case of Moshier v. Reding, supra.

5. Parties to a year to year lease may mutually covenant to restrict termination rights so as to make them dependent on the occurrence of a particular event. *E. g.* Carlisle v. Weiscopf, 237 Mass. 183, 129 N.E. 375 (1921) (lease to continue unless the lessee gave certain written notice of his intention to terminate). No such restriction is effected by the subject language in the present case; and this Court would require any restriction to be clear and specific to be of force.

with all the attendant common law rights of lessor and lessee including those of termination by notice. Moshier v. Reding, supra. The additional provision for breach of the lease provided additional and expanded powers of termination to the lessor. If no breach were to occur, as in the present case, then termination could be effected only upon proper notice.

The Baxter State Park Authority exercised only those powers of termination which were granted to it by operation of law and the terms of the lease. Notice was timely and proper and served effectively to terminate any leasehold rights of the defendants in the subject property.

The responsibility of the Baxter State Park Authority and of this Court is great to protect the vision of Percival P. Baxter who realized the precious and tenuous existence of our State's wilderness. The munificent grant of Governor Baxter to "the people of the State of Maine" was a guarantee that this inheritance will not be lost to future generations of Maine people. The wild beauty of Maine's forests is part of every Maine citizen's heritage. "The forests of America, however slighted by man, must have been a great delight of God; for they were the best he ever planted." [6] The continued enforcement of Governor Baxter's trust will insure this bounty in perpetuity.

The entry shall be:

Judgment for the plaintiffs State of Maine and Jon A. Lund, Maine Attorney General; Maynard F. Marsh, Commissioner of Inland Fisheries and Game; and Fred E. Holt, Maine Forest Commissioner, in their capacity as Baxter State Park Authority on the complaint and counterclaim. Leasehold rights of the defendants in the subject property were terminated on December 31, 1970. Costs shall be apportioned one-half to the plaintiffs and one-half to the defendants.

All Justices concurring.

6. John Muir, "The American Forests," Atlantic Monthly, Vol. 80, p. 145.