Charles FITZGERALD et al.

v.

BAXTER STATE PARK AUTHORITY
et al.

Supreme Judicial Court of Maine.

April 6, 1978.

Murray, Plumb & Murray by E. Stephen Murray (orally), Portland, for plaintiffs.

Sarah E. Redfield (orally), John M. R. Paterson, Asst. Attys. Gen., Augusta, for defendants.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

The plaintiffs, all being Maine citizens and users of Baxter State Park, brought this suit in the Superior Court seeking to restrain the Baxter State Park Authority from carrying out a program for cleaning and restoring certain areas of timber blow-down that occurred in late November 1974. After extensive hearings, the Superior Court entered, on August 24, 1976, its injunction as follows:

"Defendants are prohibited from continuing to harvest blow-down in the manner in which the present operation is being conducted, to wit: with the use of heavy equipment. Further clearance may continue, but without the use of heavy equipment, and in such a manner as will not unduly disturb the terrain and natural environment. The Baxter State Park Authority may, however, proceed to develop, and contract, plans for clearance of blow-down, which would more closely follow the terms of the trust deeds as they have been herein interpreted by the Court."

From that injunctive order the plaintiffs appealed, and the defendants [1] cross-appealed.[2] Finding no error of law in the Superior Court's decision, we deny both appeals and affirm the judgment below.

Among the many public-spirited benefactors with whom the State of Maine has been blessed, Percival Proctor Baxter [3] stands preeminent. In its combination of size, uniqueness, permanence, and vision, his gift of Baxter State Park to the people of Maine has no equal.[4] Over a period of 31 years, former Governor Baxter deeded to the State of Maine in trust a total of 201,018 acres of land, principally in Piscataquis County, for the establishment of Baxter State Park. His first gift in 1931 of about 6,000 acres, encompassing the higher areas of Mt. Katahdin and the slopes on all four sides, set a pattern that he was to follow in his succession of gifts completed in 1962. In each case he transmitted to the current

1. The complaint named as defendants not only Baxter State Park Authority but also its individual members, namely, the Director of the Bureau of Forestry, the Commissioner of Inland Fisheries and Wildlife, and the Attorney General. Subsequently, pursuant to Rule 21, M.R.Civ.P., the Attorney General of the State of Maine was added as a party defendant in his capacity as Attorney General.

2. After preparation of the voluminous record and extensive briefing by the parties, the appeals were argued on the merits before the Law Court on December 21, 1977. This court, on December 28, 1977, scheduled further briefing and oral argument on the question of the plaintiffs' standing. Oral argument before the court was heard on that question on March 2, 1978.

3. Percival Proctor Baxter (Nov. 22, 1876–June 12, 1969), a graduate of Bowdoin College (1898) and Harvard Law School (1901), was elected to the Maine House of Representatives for three terms and to the Maine Senate for two terms, and served as Maine's Governor from January 21, 1921 to January 8, 1925.

4. The court is not unmindful of other public gifts by former Governor Baxter to his state, including Mackworth Island in Falmouth and funding for the Baxter State School for the Deaf there located. 1943 P.& S.L., ch. 1; 1953 P.& S.L., ch. 44.

governor his deed of trust which was then duly submitted to the legislature for acceptance by private and special act.[5] In Governor Baxter's transmittal letters to the successive governors,[6] he set forth his grand design for a state park around Maine's highest mountain.[7] In addition to the conveyances of land, Governor Baxter in 1961 and 1965 gave the State sums in excess of $1.5 million for the care, operation, and maintenance of the Park. P.& S.L.1961, ch. 21; P.& S.L.1965, ch. 30.

By his deeds of trust Governor Baxter conveyed the lands to the State of Maine as trustee to hold in trust for the benefit of the people of Maine, subject to certain conditions for the use of the land. This case raises issues as to the application of those conditions. For the purposes of the present case, the condition of the deed of trust accepted by chapter 1 of the 1945 Private & Special Acts is typical: [8]

"TO HAVE AND TO HOLD the above described premises with all the privileges and appurtenances thereto to the State of Maine as Trustee to be forever held in Trust for the People of Maine upon the following conditions,

5. For the deeds and acceptances, see the following Private and Special Laws: 1931, ch. 23; 1933, ch. 3; 1939, ch. 1, ch. 122; 1941, ch. 1, ch. 95; 1943, ch. 1, ch. 91; 1945, ch. 1; 1947, ch. 1; 1949, ch. 1, ch. 2; 1955, ch. 1, ch. 3, ch. 61, ch. 171; 1963, ch. 1.

6. Governor Baxter's transmittal letters are printed in the Laws of Maine for the following years at the indicated pages: 1931, pp. 725–26; 1933, p. 859; 1939, pp. 846–47; 1941, pp. 760–61; 1943, pp. 698–708; 1945, pp. 982–90; 1947, pp. 1244–45; 1949, pp. 1368–70; 1955, pp. 1143–50; 1963, p. 1473.

7. In his 1955 communication to the governor and the legislature, Governor Baxter wrote in part the following:

"In 1917 I first proposed that the State make a beginning in creating a Park at Katahdin. From that date until now I have worked diligently and patiently upon this project and have seen it grow from small beginnings to its present ample proportions. In the years to come when the Forests of our State have been cut off and disappeared, when civilization has encroached upon the land we now refer to as 'Wild Land', this Park will give the people of succeeding generations a living example of what the State of Maine was 'in the good old days' before the song of the woodsman's axe and the whine of the power saw was heard in the land. I am confident that the people of Maine as time passes will appreciate this Park and that the State never will break these Trusts. I know the conscience and the Soul of Maine. The word of this State as given in Acts passed by its Legislatures and signed by its Governors is as sacred a pledge and trust as Man can make." (1955 Laws, p. 1144)

In his communication of January 3, 1963 to the then governor and the legislature, Governor Baxter announced the completion of his long-standing goal:

"Beginning with my communication of March 3, 1931 addressed to Honorable William T. Gardiner, Governor, the State has accepted from me by Legislative Acts gifts totaling 193,254 acres of forest land, forever to be held in TRUST for Public Park, Public Recreational and for Public Forestry purposes the same forever to be kept in its Natural Wild State.

"These areas from year to year have been conveyed by me to the State and have been accepted in legal form by the several Governors and Legislatures in office during the period from 1931 to 1961.

"A recent gift of 7,764 acres, the Legislature not being in Session, has been accepted by the Governor and Executive Council acting under the provisions of the Statutes. I now request you to confirm the acceptance of this latest gift of 7,764 acres of August 6, 1962 so that all my gifts of forest land to the people of Maine will have been accepted by the duly elected Governors and Legislatures of our State over this 31-year period. The acceptance of this gift will add to this Park 7,764 acres of forest land and will complete the record of my 31 years' (1931–1962) gifts of 201,018 acres made to and accepted by the people of the State of Maine.

"In order to complete the record, I request that this communication of January 3, 1963, together with the accompanying Act and Deed, be published in the Laws of Maine 1963.

"It is interesting to note that in my formal letter to Governor Gardiner in 1931, when my first gift was about 6,000 acres, I said 'I expect some day to see my ambition realized.' (Laws of Maine 1931). This brings to an end an interesting incident in Maine history." (1963 Laws, p. 1473)

8. The other deeds of trust for lands involved in the 1974 blowdown were accepted in P.& S.L. 1939, ch. 122, and P.& S.L.1949, ch. 1. There are also restrictions in some of the deeds of trust upon the use of firearms, trapping and hunting, the landing of aircraft, and the building of roads.

"(1) that the premises HEREIN donated and conveyed to the State of Maine together with all the lands HERETOFORE donated and conveyed to said State . . . by the grantor herein, forever shall be kept for and as *a State forest and public park and for public recreational purposes*;

"(2) that the said WITHIN donated and conveyed premises and also the said premises HERETOFORE donated and conveyed *forever shall be kept in their natural wild state and as a sanctuary for wild beasts and birds,* . . . " (Emphasis added)

Also involved in our present case is chapter 2 of the Private & Special Laws of 1955, which we will sometimes refer to as the "1955 interpretation act," in which the State of Maine formally joined in a declaration by Governor Baxter interpreting the terms "natural wild state" and "sanctuary for wild beasts and birds" as those terms were used by the parties in the deeds of trust. That act, by its terms, purported to authorize the State of Maine to clean, protect, and restore blowdown areas and to set priorities as among the "forever wild" and other objectives of the donor.

The State of Maine, as the trustee of Baxter State Park, has designated the Baxter State Park Authority as its agent "to satisfy the terms of the Trust." 12 M.R.S.A. § 900 (1964). The Authority is given "full power in the control and management" of the Park, including the authority to receive and expend for the maintenance, operation, and expansion of the Park moneys from the trust fund established for those purposes by Governor Baxter. 12 M.R.S.A. § 901 (1964). The Authority, established early in Governor Baxter's program of gifts to the State, 1933 Laws, ch. 281, is now comprised of the Attorney General, the Director of the Bureau of Forestry, and the Commissioner of Inland Fisheries and Wildlife. See *State v. Fin & Feather Club,* Me., 316 A.2d 351 (1974). The Authority exercises police supervision over the Park, 12 M.R.S.A. § 905 (1964), and employs a Director for the Park and other personnel appropriate to carry out its statutory responsibilities, 12 M.R.S.A. § 904 (1964).

In late November 1974 an aggregate of some 3,300 acres in the southwest portion of the Park suffered a severe blowdown apparently caused by a combination of natural conditions, including extreme saturation of the grounds, very heavy, wet snows, and extraordinarily high winds. After receiving the report of a professional aerial survey of the affected areas and after discussion among the Authority members and with members of the Baxter Park Advisory Committee, including Governor Baxter's nearest living relative, the Authority hired a consulting forester, Vladek Kolman,[9] to evaluate the blowdown damage and prepare a cleanup program for the affected areas. Mr. Kolman's report followed his observation, on foot and from the air, of the areas affected by the blowdown, and for reasons that he stated in the report and expanded upon in testimony before the court below, he recommended the removal of the blowdown from all but some 300 acres. His reasons for this cleanup program included the necessity of restoring the forest soil in the blowdown areas to its original horizontal position in order to enhance the regeneration of the blowdown stands, avoidance of insect infestation, reduction of fire danger, and protection of water quality and fish life. After published notice, the Authority held a public hearing at Kidney Pond Camps in Baxter State Park on September 9, 1975, following which the Authority voted unanimously to proceed with the cleanup operations recommended by Mr. Kolman. The Authority then proceeded to solicit bids for the removal of dead and dying trees in areas designated by the Kolman report. The Authority encountered considerable difficulty in obtaining bids, apparently principally because of the extensive limitations

---

9. Mr. Kolman, through his company, Kolman Land Consultants, Inc., obtained the contract on its successful bid.

that the proposed contract would impose upon contractors' operations in order to protect the environment. Finally, a bid of Stanley Sproul Company was accepted by the Authority for a single blowdown area consisting of about 510 acres, and pursuant to the contract Sproul began work in the Park in early January 1976. The Sproul operations, however, were apparently quickly suspended with the commencement of hearings in this proceeding.

The complaint in this action, filed on November 20, 1976, sought, *inter alia*, an injunction restraining the Baxter State Park Authority from proceeding with the cleanup. The Superior Court held a hearing on the plaintiffs' request for a preliminary injunction on January 15, 1976, and a hearing jointly on their request for preliminary and permanent relief on February 26 and 27, 1976. Without entering any preliminary injunction, the Superior Court, on August 24, 1976, issued its final decision, recognizing the authority of the Baxter State Park Authority to clean, protect, and restore the Park from the blowdown, but enjoining it from carrying out the cleanup in the manner proposed, particularly from using heavy equipment. Although the Authority chose not to go ahead with cleaning the blowdown areas in the restricted manner permitted by the Superior Court's order, plaintiffs took a timely appeal, and the defendants cross-appealed.

On this appeal by the plaintiffs and the cross-appeal by the defendants, we must on the merits address two principal questions: (1) Did the Superior Court err in holding that the 1955 interpretation act may be looked to in construing the intent of the prior deeds of trust given by Governor Baxter and accepted by the State of Maine; and (2) Did the Superior Court err in concluding that the plan adopted by the Baxter State Park Authority for cleaning and restoring the blowdown areas exceeded what was permissible under the applicable deeds of trust as so construed? We find no error on either score, and accordingly we deny both the appeal and the cross-appeal and affirm the judgment below.

## I. *Standing*

A threshold question demands our attention: In all the circumstances present here, do the five individuals who are the plaintiffs have standing to maintain this action? To answer that inquiry, we must first identify the nature of the legal relationship which Governor Baxter's gifts created among the State, the people of Maine, and the Park.

■ No one reading the deeds of trust and Governor Baxter's transmittal letters is left with the slightest doubt of his intention to create a charitable trust with respect to the land he conveyed to the State of Maine. The State is specifically named trustee of the land, as well as the associated funds, and, by declaration in the deeds of trust, formally accepted by the legislature, the people of Maine are designated as the general class of beneficiaries. Each deed of conveyance states that the land is to be held in trust forever "for state forest, public park and public recreational purposes," subject to the conditions and restrictions listed in each particular deed. There can be no doubt that retention and use, under the State's trusteeship, of the donated property for such purposes is a charitable trust. This legal requirement meets our definition of a charitable trust, *see, e. g., Bills v. Pease,* 116 Me. 98, 100 A. 146 (1917), and fully satisfies the definition of a charitable trust given in the *Restatement (Second) of Trusts* § 348 (1959): "[A] fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose."

It is long-established law, coming down from at least as early as Elizabethan England, that "the community has an interest in the enforcement of [charitable] trusts and the Attorney General represents the community in seeing that the trusts are properly performed." 4 A. Scott, *The Law of Trusts* § 391 at 3002 (3d ed. 1967). Maine, as have our mother commonwealth and several other states, *id.* at 3003 n. 7, has

declared this duty of the Attorney General by a statute first adopted by P.L.1905, ch. 162, § 5:

> "The Attorney General shall enforce due application of funds given or appropriated to public charities within the State and prevent breaches of trust in the administration thereof." 5 M.R.S.A. § 194 (1964).

In other jurisdictions it is an oft-repeated precept that *only* the Attorney General has the authority to enforce such charitable trusts. 4 A. Scott, *The Law of Trusts* § 391 at 3006 (3d ed. 1967). Although no pertinent Maine authority has been found, the implication of section 194 combined with the desirability of protecting charities from a harassing multiplicity of suits might appropriately lead us, without deciding the general issue, to use that precept as a starting point for discussing the plaintiffs' standing here.

 In the particular circumstances of this case, however, the Attorney General is disabled from fulfilling his statutory duty and bringing suit against the State of Maine. The Attorney General is himself a member *ex officio* of the Baxter State Park Authority, the agency created by the State "to satisfy the terms of the Trust." 12 M.R.S.A. §§ 900–01 (1964). In addition, he is, by virtue of his election pursuant to art. IX, section 11 of the Maine constitution, the chief attorney for the trustee. His own acts have been drawn in question by the plaintiffs as being inconsistent with the terms of Governor Baxter's trust, and as one member of the Authority he is accordingly named as a defendant in this action.[10] The Attorney General could not properly take in litigation a position adverse to a state agency on which he sits and for which he acts as counsel. *Cf.* ABA, *Code of Professional Responsibility*, Canon 5 (1976). By force of necessity the enforcer of the Baxter trust, through judicial action, must be someone other than the Attorney General.

**10.** The plaintiffs, without objection, have also joined him in his capacity as Attorney General,

In determining whether these five individual plaintiffs can sue, we must note that the Baxter State Park is more than just a charitable trust. The legislature, in 12 M.R. S.A. § 900 *et seq.* (1964), has created the Baxter State Park with enumerated statutory restrictions on use, duplicating those which Governor Baxter imposed in his deeds of trust. Moreover, the Baxter State Park Authority is created by statute to manage and regulate use of the Park in accordance with the grand design of Governor Baxter's gift to the people of Maine. Section 900 of Title 12 declares that "[s]olemnly cognizant of the responsibility, it shall always be the purpose of the [A]uthority to satisfy the terms of the Trust." By force of statute, therefore, any action by the Baxter State Park Authority in operating and regulating the use of the Park is not only the action of the *trustee of a charitable trust,* of which the Park Authority is the agent, but also *governmental action* in carrying out the mission and mandate imposed by statute. In one sense, therefore, the Baxter State Park, as a creature of statute, bears all the same features as it would have if the lands had been acquired from the general revenues of the State and the legislature had imposed by statute restrictions on use identical to the legal requirements imposed by the Baxter deeds of trust.

Representative of each plaintiff's allegations regarding standing in this case are those of plaintiff Ronald Davis:

> "The Plaintiff Ronald Davis is a citizen, domiciliary, voter and property owner of the State of Maine. Since approximately 1955 Mr. Davis has hiked, camped and otherwise made use of the Baxter State Park including, in his capacity as teacher and researcher, leading ecology field trips of students to the park and in his capacity as a researcher visiting the park and compiling a history of the vegetation in the park. Mr. Davis visits the park at least four times each year and plans to continue to do so."

presumably because of his section 194 function to enforce charitable trusts.

■ We are thus presented with the question whether these five individual plaintiffs, as Maine citizens, domiciliaries, voters and property owners, and actual *users* of Baxter State Park, have standing to obtain injunctive relief against a state agency's carrying out its proposed program to clean the 1974 blowdown areas. Regardless whether, as beneficiaries with a special interest in a charitable trust, these plaintiffs may enforce the same,[11] we hold that they do have standing to seek an injunction against the Baxter State Park Authority on the basis that the proposed cleanup would be violative of the obligation imposed by *statute* upon the Authority "to satisfy the terms of the Trust."

■ These five plaintiffs have each alleged sufficient direct and personal injury to give them standing to question the Authority's proposed activity, whether conceived in terms of "injury in fact," *cf. Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), or "particularized injury," *cf. In the Matter of Elizabeth Lappie*, Me., 377 A.2d 441, 443 (1977). In the *Sierra Club* case, the organizational plaintiff sued for a declaratory judgment and an injunction against a proposed ski development in a national forest. The Sierra Club asserted that the development "would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations"—assertions not unlike those made by the plaintiffs in the case at bar. The United States Supreme Court stated the following with direct pertinence here:

"Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process. But *the 'injury in fact' test requires* more that an injury to a cognizable interest. It requires *that the party seeking review be himself among the injured.*

"The impact of the proposed changes in the environment of Mineral King will not fall indiscriminately upon every citizen. *The alleged injury will be felt directly only by those who use Mineral King and Sequoia National Park, and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort.*" (Emphasis added) *Sierra Club v. Morton, supra* at 734–35, 92 S.Ct. at 1366.[12]

In that case the Court found that the Sierra Club did not have standing because it had "failed to allege that it or its members would be affected in any of their activities or pastimes" by the proposed development, and further, that:

"Nowhere in the pleadings or affidavits did the Club state that its members use

11. We note, without deciding, the argument made by all parties before us that these five plaintiffs come within the rule of law that permits specially interested beneficiaries to bring suit to enforce a charitable trust intended for their benefit. *See, e. g.,* 4 A. Scott, *The Law of Trusts* § 391 at 3007 (3d ed. 1967). *Jones v. Grant,* 344 So.2d 1210 (Ala.1977); *Holt v. College of Osteopathic Physicians and Surgeons,* 61 Cal.2d 750, 40 Cal.Rptr. 244, 394 P.2d 932 (1964); *Mary S. Fithian Night School v. College Board of Presbyterian Church,* 88 N.J.Eq. 468, 102 A. 855 (1918). We express no opinion whether these plaintiffs would have any standing if the Attorney General were not disabled from carrying out his statutory duty to enforce the charitable trust *and if* Baxter State Park were merely a charitable trust, and not also a public park required to be operated in accordance with the statute.

12. Commenting upon the trend of cases under statutes authorizing judicial review of federal agency action, the Supreme Court noted the movement "toward recognizing that injuries other than economic harm are sufficient to bring a person within the meaning of the statutory language, and toward discarding the notion that an injury that is widely shared is *ipso facto* not an injury sufficient to provide the basis for judicial review." *Sierra Club v. Morton, supra* at 738, 92 S.Ct. at 1368. The Court further noted that the requirement of "injury in fact" or actual aggrievement serves as "at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." *Id.* at 740, 92 S.Ct. at 1369.

Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." *Id.* at 735, 92 S.Ct. at 1366.

The Supreme Court clearly required such "allegations of individualized injury" (405 U.S. at 736, 92 S.Ct. 1361), and the implication is clear that if the plaintiffs in that case had alleged and proven such "injury in fact," they would have established standing.[13]

■ The pleading and proof in the case at bar fully provided what was prominently omitted in the *Sierra Club* pleadings. All five of the individual plaintiffs have in the past been substantial users of Baxter State Park and intend to use it substantially in the future. By express stipulation of the parties,

> "[i]f the action complained of by the Plaintiffs and taken by the Baxter State Park Authority is without legal support and found to be unauthorized by law or terms of the deeds of trust, then the Plaintiffs have been injured in their use and enjoyment of Baxter State Park and its resources."

Thus, the stipulation establishes a direct and personal injury suffered by the plaintiffs to their interest in Baxter State Park which, although not an economic interest in the sense of involving their livelihood or financial liability, is nonetheless worthy of the protection of the law. *Sierra Club v. Morton, supra.*

■ We need not decide, as is urged upon us by both the Attorney General and the plaintiffs, that any person in the State of Maine, by virtue of his status as a beneficiary of Governor Baxter's charitable trust, may sue to enforce the trust. That subgroup of Maine people who are actual users of the Park, itself substantial in number, is sufficiently large to assure that the public's interest in administration of the Park in compliance with Governor Baxter's wishes will be adequately represented. Any citizen of Maine who shows himself to have suffered "particularized injury" as a result of action of the Baxter State Park Authority has standing to obtain judicial review and to seek injunctive relief against that proposed action. *Cf. In the Matter of Elizabeth Lappie, supra; In the Matter of International Paper Co.,* Me., 363 A.2d 235, 238–39 (1976); 2 Field, McKusick & Wroth, *Maine Civil Practice* § 72.2a (1977 Supp.).

## II. *Admissibility of 1955 Interpretation Act*

■ The 1974 blowdown affected portions of Baxter State Park that Governor Baxter conveyed by deeds of trust accepted by the legislature in 1939, 1945, and 1949. P.& S.L.1939, ch. 122; P.& S.L.1945, ch. 1; P.& S.L.1949, ch. 1. Those deeds, a typical one of which we have previously quoted, put restrictions on use of the land thus conveyed in trust. The overall question posed in the complaint seeking an injunction against the Authority's carrying out its plan for cleaning and restoring the 1974 blowdown area is whether the proposed operation is consistent with forever (i) using the area for "state forest, public park and public recreational purposes," (ii) leaving it "in the natural wild state," and (iii) keeping it "as a sanctuary for wild beasts and birds." The Superior Court, faced with determining whether the proposed project was compatible with the terms of the trust impressed upon the land at issue, held that the trust instruments themselves contained ambiguity, and hence it could resort for clarification to a 1955 "Act . . . Interpreting the Phrases 'Natural Wild State' and 'Sanctuary for Wild Beasts and Birds' in Deeds from said Baxter to said State of Maine."[14] We agree that the 1955 inter-

13. In fact, the Court specifically noted in the *Sierra Club* opinion that its decision "does not, of course, bar the Sierra Club from seeking in the District Court to amend its complaint by a motion under Rule 15, Federal Rules of Civil Procedure." *Sierra Club v. Morton, supra* at 736 n. 8, 92 S.Ct. at 1366. This the Sierra Club

apparently went on to do. *See Sierra Club v. Morton,* 348 F.Supp. 219, 220 (N.D.Cal.1972).

14. P.& S.L.1955, ch. 2, herein referred to as the 1955 interpretation act, in relevant part was entitled "An Act . . . Interpreting the phrases 'Natural Wild State' and 'Sanctuary for

pretation act may appropriately be taken into account in determining the legality of removing the 1974 blowdown under the proposed plan.

If the deeds of trust alone are looked to in seeking Governor Baxter's intent, we are hard put to say that there is one obvious and exclusive meaning for the combination of phrases he used. None of the three deeds contains any language purporting to set a priority among the purposes of the Park. The deeds of trust do not constitute a mathematical formula which applied to the variables of this case leads inevitably to one and only one solution. With only the language of the deeds of trust as our guide, we could not determine with any confidence, for example, whether the blowdown removal (i) would be authorized because desirable for "public recreational purposes," in reducing fire hazard and restoring the accessibility of the affected areas to people using the Park for public recreation, or (ii)

would be in breach of the trust because contrary to the deeds' requirement that the Park be kept forever in its "natural wild state." We cannot with any confidence, from the deeds alone, set priorities among the several noble purposes to which Governor Baxter dedicated the Park.

■ It was apparently just such uncertainty that, upon being pointed out to Governor Baxter, led him in 1955 to execute a formal instrument purporting to interpret the phrases "natural wild state" and "sanctuary for wild beasts and birds" in the prior deeds of trust. The 1955 legislature evidenced its concurrence by enacting that interpretive declaration into law.[15] That 1955 interpretation act in terms authorized the State of Maine, the trustee, "to clean, protect and restore areas of forest growth damaged by ACTS OF NATURE such as blowdowns . . . in order that the forest growth of the Park may be protected,

Wild Beasts and Birds' in Deeds from said Baxter to said State·of Maine" and read as follows:

"WHEREAS it is in the public interest to have a correct interpretation of the phrase 'natural wild state' and of the phrase 'sanctuary for wild beasts and birds' in the above mentioned Deed of January 12, 1954 as well as wherever they appear in all the former Deeds and conveyances made to the State by Percival Proctor Baxter relating to Baxter State Park:

"NOW THEREFORE it is mutually understood by the Grantor and Grantee in said Park Deeds that the following paragraphs express the intent of the Parties as to the interpretation of said phrases, and the same are accepted as applying to all the said Deeds and Conveyances.

"NATURAL WILD STATE

"The State of Maine is authorized to clean, protect and restore areas of forest growth damaged by ACTS OF NATURE such as blowdowns, fire, floods, slides, infestation of insects and disease or other damage caused by ACTS OF NATURE in order that the forest growth of the Park may be protected, encouraged and restored.

"The State is authorized to build trails and access roads to camp sites, to use timber from this area for fire control and firewood and to construct shelters and lean-tos for mountain climbers and other lovers of nature in its wild state.

"This area is to be maintained primarily as a Wilderness and recreational purposes are to be regarded as of secondary importance

and shall not encroach upon the main objective of this area which is to be 'Forever Wild.'

"The existing leases of the land and buildings at Kidney Pond, Daisey Pond and on the shores of the Matagamon Lakes may be continued by and in the discretion of the Baxter State Park Authority.

"SANCTUARY FOR WILD BEASTS
AND BIRDS

"The State is authorized to maintain the proper balance of nature among the different species of wild life; to control predators that may become a menace to other species; to control disease and epidemics of the wild life of the Park. Such control shall be exercised by the Baxter State Park Authority. The destruction of any specie of wild life shall be carried on exclusively by the Personnel of said Authority and of the Forest and Fish and Game Departments.

"All work carried on by the State in connection with the above shall be in accordance with the best forestry and wild life practices and shall be undertaken having in mind that the sole purpose of the donor in creating this Park is to protect the forests and wild life therein as a great wilderness area unspoiled by Man. Nothing shall be done for the purpose of obtaining income but should there be incidental income it is to be used solely for the care, operation and protection of this Wilderness area."

15. See n. 14 above.

encouraged and restored." At the same time, the 1955 Act set priorities as between maintenance of the area "forever wild" and its use for recreational purposes. Given the ambiguity that plainly exists in the language of the trust deeds, due to the inherent tension among the several Park purposes, the Superior Court correctly sought help from a document extrinsic to the trust instruments. *See Canal National Bank v. Noyes*, Me., 348 A.2d 232, 234–35 (1975).

The legislation itself was entitled an act of "interpretation" and recited the following purpose for the enactment:

> "WHEREAS it is in the public interest to have a *correct interpretation* of the phrase 'natural wild state' and of the phrase 'sanctuary for wild beasts and birds' in the above mentioned Deed of January 12, 1954 as well as wherever they appear in all the former Deeds and conveyances made to the State by Percival Proctor Baxter relating to Baxter State Park." (Emphasis added) (P.& S.L.1955, ch. 2)

There is no reason that Governor Baxter and the trustee, the State of Maine, acting through the legislature, should not be taken at their word; they were *interpreting* the prior deeds of trust to which they alone were parties and were *not modifying* them. There are other reasons for not rejecting Governor Baxter's declaration that *his* deeds of trust required clarification. We should follow Governor Baxter's interpretation unless some clear legal restraint stands in the way. We see none. Moreover, that same year, 1955, and subsequently through 1962, Governor Baxter continued his 31-year program of gifts of land by adding 34,342 acres to the Park, subject to almost the identical conditions specified in the deeds of trust executed by him starting in 1931. As to those later deeds, the 1955 interpretation act is clearly a declaration of the settlor's intent, meant to be read together with the subsequent deeds. In 1961 and 1965 Governor Baxter also donated to the State of Maine corporate shares then worth over $1.5 million for the purpose of sharing "with the State in part the cost of caring for, protecting and operating said area of land *in accordance with the conditions* in the several acts of the Legislature accepting said gifts." (Emphasis added) Laws of 1965 at 1181. It would be anomalous indeed if the identically worded restrictions from 1955 on are interpreted to permit the State of Maine "to clean, protect and restore areas of forest growth damaged by ACTS OF NATURE such as blowdowns," but the earlier ones are not. Thus, we construe the same restrictions to mean the same thing, whether used in pre-1955 or post-1955 deeds of trust. In view of the ambiguity arising from the inconsistent phrases in the deeds of trust, we must seek help outside the deeds, and no better help can be found than Governor Baxter's own formal interpretation at a time while he was still actively implementing his vision for Baxter State Park.

### III. Validity of the Superior Court's Restrictions on Cleanup Program

Having concluded that the 1955 act could properly be consulted to aid in construing the Baxter deeds of trust, the Superior Court turned to the ultimate question presented, *i. e.*, whether the cleanup program embarked upon by the Authority complied with those deeds of trust as so construed. When the court held that program up against the interpretation of the trust deeds provided by the 1955 act, it found that the program as proposed to be carried out by the contractor for the Authority would "violate the terms of the trust" "most significantly" in three respects:

> "(1) the size and nature of the equipment being used to harvest the fallen trees;
>
> "(2) the fact that the present operation involves clearing of areas least likely to be visited by campers and hikers;
>
> "(3) the fact that only the trunks of the fallen trees are being removed and that highly flammable slash material will be left to decompose."

The court elaborated upon these general conclusions regarding the impermissible

*manner* and *scope* of the proposed action in specific supporting findings.[16]

█ In reviewing the correctness of the Superior Court's conclusions, we note at the outset that the justice below was faced with a question partaking of both law and fact. In the first instance, the court had to interpret the 1955 interpretation act and determine its effect upon the restrictions in the deeds of trust. That instrument, though it broadly declares the authority of the State of Maine "to clean, protect and restore" blowdown areas in Baxter State Park, at the same time declares that "*the main objective of this area . . . is to be 'Forever Wild.'*" (Emphasis added) It further directs that the restoration work shall be carried on "in accordance with the best forestry and wild life practices" and that "[n]othing shall be done for the purpose of obtaining income . . . ." Thus,

even as the deeds of trust involve ambiguity-creating tensions among the conditions placed by them upon the use of Baxter State Park, the 1955 act—while resolving the ambiguities of the deeds to the extent of establishing that *some* cleaning of blowdown areas is permitted—generates its *own* ambiguities, only slightly more focused than those of the deeds. To the extent that it is possible to harmonize those competing purposes by construing the facial language of the 1955 act, the question is one of law, *cf. e. g., Lewiston Firefighters Ass'n, Local 785 v. City of Lewiston,* Me., 354 A.2d 154, 163 (1976), as to which this court finds no quarrel with the Superior Court's interpretation. To the extent, however, that the 1955 act contains ambiguity such that its meaning takes shape only in relation to the actual facts of each case, the question before the Superior Court was one of fact as

16. "The evidence presented at both hearings established that the present operation utilized an extremely large commercial skidder to pull out the downed trees. Use of such a skidder would necessitate widening of roads in the park . . . . Off road use of the skidder would result in crushing of vegetation and a disturbance in the natural growth patterns. There was also some evidence that the skidder was actually moved through the blow-down area rather than positioned at the outskirts . . . . Although the contract provided restrictions, not common in commercial contracts, which prohibited use of the skidder near streams, provided for reseeding of areas tracked by the skidder, and provided for reconstruction of the roads, the Court finds that these restrictions are insufficient to counter the extensive environmental impact of the use of such equipment.

"The present operation involving the contract with Mr. Sproul provided for clearance of an area rarely visited by campers and hikers. Witnesses for both Plaintiffs and Defendants generally conceded that man presented the greatest forest fire hazard in the park. Since the prime reason for clearing the blow-down was to prevent forest fires, the benefit of clearing blow-down in such an area appears to be minimal when compared to the impact upon the wilderness.

"Finally, because only tree trunks are to be removed pursuant to the present contract and branches, leaves, and small growth are to be left, the argument that the danger of forest fire would be reduced by the harvesting is severely undercut. The testimony, however, was contradictory upon this issue. Plaintiffs' witnesses argued that the slow decomposition of tree

trunks which were not removed would increase the long-term danger of fire. On the whole, however, it did not appear from the testimony that the danger of fire was appreciably different were the trees to be cleared or left.

"It is the opinion of this Court that Plaintiffs were able to show that the type of operation presently being carried on was of minimal protective value when compared to the environmental impact and the effect upon the nature of wilderness envisioned by Governor Baxter.

"The actions taken by the Authority may have been the most 'practical in terms of getting the blow-down cleared in the most economical manner.' This is not to say, however, that the Authority was motivated by economic gain or that they took no steps to protect the environment from the adverse impact of the clearing operation. This Court states only that the Authority did not sufficiently consider the wilderness emphasis apparent in both the trust deeds and the subsequent interpretation of P.& S.L.1955, c. 2.

"The question now is what steps may the Authority take to accomplish Governor Baxter's goals under the terms of his interpretation of 'Natural Wild State.' This Court finds merit in Plaintiffs' suggestion that logging be permitted in those areas immediately adjacent to the roads and campgrounds where due to man's presence the danger of forest fire is greatest. Logging in those areas which already show evidence of man's presence would far less greatly disturb the natural wild state and would, in the Court's opinion, more closely coincide with the type of operation envisioned by Governor Baxter."

well as law. We are aware of the battle that has raged, and indeed still rages at times, over whether determinations of mixed questions of law and fact are subject to appellate review by a "clearly erroneous" standard. *See* 9 Wright & Miller, *Federal Practice and Procedure* §§ 2589–91 (1971). We need not choose sides in that ongoing battle, to be bound for all times and all cases. Suffice it here to say that in determining whether the Authority's program for harvesting the blowdown embraced the best forestry and wildlife practices and was consistent with maintaining the Park "primarily as a Wilderness," the inquiry required of the court was more "factual" than "legal." *Cf. Martin v. Vector Co., Inc.*, 498 F.2d 16, 22 (1st Cir. 1974). The factual conclusions spelled out by the court for enjoining the particular manner and scope of the Authority's planned harvesting were free of any obvious disregard of applicable principles of law or gross overemphasis of any one relevant principle of the 1955 act to the exclusion of others. *Cf. Famous Knitwear Corp. v. Drug Fair, Inc.*, 493 F.2d 251, 252–53 (4th Cir. 1974). Under these circumstances we should accord the Superior Court's findings the respect implicit in the "clearly erroneous" rule. Rule 52(a), M.R. Civ.P.; *see* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 52.7 (2d ed. 1970).

Ten witnesses, all trained in or expert in some field relating to forest management and ecology, testified at the hearings before the Superior Court justice. The plaintiffs' witnesses gave opinions regarding the Kolman plan and its execution by the Sproul company which were, with respect to the issue of the "best" forestry practice, in disagreement with the opinions of the defendants' witnesses. Dr. Miron Heinselman, a forestry ecologist and forester, and Dr. William Reiners, a plant ecologist, for example, testified on behalf of the plaintiffs that the heavy commercial skidder being used by Sproul would leave prominent trails, in which grasses, bushes, and deciduous trees would grow in obvious and unnatural contrast to the coniferous forest surrounding the trails. Regarding the forest fire hazard which was a primary justification for the Authority's planned blowdown removal, Drs. Heinselman and Reiners testified that the slash left behind from the salvage operation would cause at least as great a forest fire danger as the blowdown itself. Furthermore, although the Kolman plan provided for removing blowdown in some 3,000 acres of affected land, divided into five contracting areas, less than an estimated 200 acres of that land lay in immediate proximity to the Park campgrounds and roads where, due to the presence of Park visitors, the forest fire danger due to the blowdowns was the highest. The slash created by the harvesting operation would also, unless chipped, inhibit the natural regeneration and restoration of forest growth to at least the same extent as the most heavily blowndown areas, or "jackstraw piles." Melvin Ames, a tree farmer and forest manager, flatly concluded that the terms of the Sproul contract for removing blowdowns and its manner of execution were not in accordance with the "best forestry and wildlife practices."

The Authority's witnesses included Maynard Marsh, the Commissioner of Inland Fisheries and Wildlife and a member of the Authority, Vladek Kolman, the consulting forester who drafted the Kolman plan for harvesting the blowdowns and "restoring" forest growth, and Professors Arthur Randall and Ralph Griffin of the University of Maine who taught in the fields of forest fire control and forest protection, and forest ecology, respectively. All testified that the blowdown, particularly in the campground and road areas, posed an acute forest fire hazard. Regarding the manner of removing the fallen trees, Kolman himself testified that he had first contemplated using horses instead of skidders, but that it had not been possible to secure the number of horses necessary to carry out the project. Commissioner Marsh believed that the scope and method of the plan was both consistent with the best forestry and wildlife management practices, and with keeping the land in its natural wild state. In his opinion, the larger species of game, such as bear and moose, would in fact benefit from

clearance of the blowdown in terms of increased habitat. The testimony of the professors was largely directed toward the question of the forest fire danger and the difficulty of controlling any fire in the areas of heavy blowdown.

In reaching its factual findings,[17] the Superior Court had before it not only the witnesses' extensive expert testimony, but also some forty exhibits, among which were Sproul's contract with the Authority and a large number of photographs of the five areas covered by the Kolman plan. From that evidence, all of which is now before this court on appeal, it is clear that the Superior Court's findings are supported by substantial evidence and cannot be said to be clearly erroneous. Given those factual findings, we find unimpeachable the court's further conclusions that, as a matter of law, implementation of the plan would result in a breach of the trust conditions. The deeds of trust, as illuminated by the 1955 interpretation act, require that the Park land be primarily maintained in its "natural wild state," except to the limited extent, consistent with the best forestry and wildlife practices, that human intervention to counteract an act of nature, such as a blowdown, is essential to protect one of the Park's other purposes.

■ Finally, we find no error in the Superior Court's measuring the Authority's action against the mandates of the deeds of trust, as opposed to that standard by which governmental action is ordinarily sustained if supported by substantial evidence. *Cf. Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 317 (1978); *Frank v. Assessors of Skowhegan*, Me., 329

A.2d 167, 170 (1974). The documentation of the Baxter gift program over its 31 years is filled with evidence of the donor's desire to impose a fiduciary obligation upon the State and its agent, the Authority, and of his expectation that designating the State itself as trustee would assure permanence and fidelity in discharge of the fiduciary obligation formally assumed by a succession of legislatures and governors. The Authority, in the action being reviewed by the Superior Court, was performing a trustee function as well as a governmental function, and it must be held accountable to that more stringent standard.

■ Moreover, the trust created by Governor Baxter was not a "discretionary trust," in the sense that the State of Maine, or any of the three State department heads who comprise its agent, are to do what *they* deem best in carrying out the donor's general purposes.[18] Rather, the members of the Authority acting for the State of Maine must administer the trust like any private trustees of a charitable trust, exercising their best judgment, informed by the Attorney General's advice on any legal question and, where necessary, by instructions from a court of equity. See 14 M.R.S.A. § 6051(10) (1964). At the same time, even though the Baxter trust is not a discretionary one, the expert judgment of the members of the Park Authority, created as it was in 1933, at the very outset of Governor Baxter's gift program, should generally be accorded great weight in choice of methods for carrying out the donor's intent. The membership in the Authority, obviously selected by Governor Baxter himself and ratified by him by his subsequent gifts, consists

17. See n. 16 above.

18. Nothing we said in *State v. Fin & Feather Club, supra*, conflicts with our view of the nature of the trust created by Governor Baxter and accepted by the State of Maine as trustee. *Fin & Feather* was concerned with the delegation of powers by the trustee to its agent, the Baxter State Park Authority, and only in that context did we say:

"The grant of power to the Park Authority in [12 M.R.S.A.] § 901 for the management and control of Baxter State Park is broad and

greatly dependent on the discretion of the Park Authority members." *Id.* at 355.

That discretion, however, was necessarily limited to such as the State of Maine could give; and "[i]n determining the parameters of permissible action, this Court is mindful of Governor Baxter's intent . . . ." *Ibid.* We went on to say that "broad powers of control" *as against other State agencies* was given "to three State officers, who would be exclusively responsible for seeing that the terms of the [Baxter] trust are *strictly* satisfied." (Emphasis added) *Ibid.*

---

of the State's principal officers in the professions of the law, forestry, and fish and wildlife management. Both Governor Baxter and the legislature placed their confidence in the judgment and integrity of those high state officials. If two or more methods of dealing with a particular Park problem are equally consistent with Governor Baxter's trust instructions, the method chosen by the Authority would normally be controlling—provided, of course, that the Authority follows any procedures prescribed by state law for arriving at its decision.[19]

We find no error in any of the rulings made by the Superior Court in entering the judgment below. Consequently, the entry must be:

Appeal and cross-appeal denied.

Judgment affirmed.

POMEROY and DELAHANTY, JJ., did not sit.

19. We reject the plaintiffs' contention that, as applied in the present case, the Authority's adoption of Mr. Kolman's recommendation for cleaning the blowdown areas constituted Authority "rulemaking" within section 903 of Title 12, and hence was invalid for failure to comply with the procedures there prescribed. Of course, the Baxter Park Authority's agency relationship is governed by statute, and the statutory obligations superimposed upon the Authority place upon it responsibilities for regularity of decisionmaking and action not borne by private trustees (or agents thereof) acting on behalf of a typical charitable trust. Decisions of such a managerial nature as those here involved, however, are not "rules" as would require the Authority to comply with section 903. Although no single definition of a "rule" has gained universal acceptance, see 1 K. Davis, Administrative Law Treatise § 5.01 (1958), it is generally recognized that a rule bears marked similarities to a legislative act, in that typically it is addressed to unnamed persons or situations and is designed to have operative effect primarily in future application to specific instances. Id. at 285–89. The Authority's decisions that are here questioned bear none of the features commonly noted as characteristic of such a "rule."