Roger NORMAND et al.

v.

BAXTER STATE PARK AUTHORITY.

Supreme Judicial Court of Maine.

Argued Jan. 15, 1986.

Decided May 6, 1986.

Barbara B. Lounsbury (orally), Auburn, for plaintiffs.

Rufus E. Brown, Deputy Atty. Gen. (orally), Augusta, for defendant.

Robert J. Allen, Downeast Law Offices, Augusta, for intervenor, Natural Resources Council of Maine.

McKUSICK, Chief Justice.

Plaintiffs, individual users of Baxter State Park,[1] and intervenor Natural Resources Council of Maine challenge the legality of Park Rule 19,[2] a regulation issued by defendant Baxter State Park Authority that permits limited use of snowmobiles by members of the public for access to the Park in the wintertime.[3] Basically, Rule 19 permits snowmobiles to travel only on the perimeter road, so-called, one of the Park roads open to automobiles in the summertime. See the map attached to this opinion as Appendix A. On appeal from the Superior Court (Kennebec County), which upheld Rule 19, appellants argue that the rule is invalid because it violates the terms and purposes of the Baxter State Park Trust and because it was not adopted by a unanimous vote of the three members of the Authority. We deny the appeal and affirm the judgment.

## I. Background

### A. The Park

Baxter State Park consists of lands deeded between 1931 and 1962 by former Governor Percival Baxter to the State and administered pursuant to a unique charitable trust.[4] No single document sets forth the

---

1. Of the seven original plaintiffs in this action, only Roger Normand, James Haddow, and David Tyler appeal the judgment of the Superior Court.

2. Baxter State Park, Rules and Regulations No. 19 (Rev.1982) provides in full:

   **SNOWMOBILES:** Snowmobiles may be used on Matagamon and Webster Lakes and on the unplowed portions of the regular road system currently maintained by the Department of Transportation for vehicular traffic in the summer, excluding, however, the portion of the Park Perimeter Road, not presently in use, passing by Dwelley Pond. Snowmobiles also shall not be allowed on the roads into South Branch Pond, Roaring Brook, Daicey Pond, Kidney Pond, and the tote road into Katahdin Lake from Avalanche Field, but shall be allowed on the one-half mile section over the easterly projection of Baxter Park in Township 6, Range 8 along the west side of the East Branch of the Penobscot River, a one-mile section along the East Branch of the Penobscot River in Township 6, Range 9 from the westerly end of Second Lake Grand Matagamon, and the Telos cut-off road from the Telos Gatehouse to the Park Perimeter Road via Morse Mountain. Use of all other roads, lakes and trails or any other portion of the Park by snowmobiles is prohibited, except by authorized personnel on Park business. Operators travel at their own risk and must comply with all requirements of State laws and drive safely at all times. Operation by persons under 10 years of age is prohibited.

3. This opinion will discuss only the use of snowmobiles in the Park by members of the public, and not their use, as permitted by Rule 19, "by authorized personnel on Park business." None of the parties contest the legality of the latter administrative or emergency use.

4. *Fitzgerald v. Baxter State Park Authority*, 385 A.2d 189, 191–92 (Me.1978), describes the history of the Park as follows:

   Among the many public-spirited benefactors with whom the State of Maine has been blessed, Percival Proctor Baxter stands preeminent. In its combination of size, uniqueness, permanence, and vision, his gift of Baxter State Park to the people of Maine has no equal. Over a period of 31 years, former Governor Baxter deeded to the State of Maine in trust a total of 201,018 acres of land, principally in Piscataquis County, for the establishment of Baxter State Park. His first gift in 1931 of about 6,000 acres, encompassing the

terms of the Baxter State Park Trust (the trust). Instead, the trust evolved over time to reflect Governor Baxter's intent as embodied in his deeds [5] and transmittal letters.[6] The deeds conveyed land to the State in trust for the benefit of the people of Maine, subject to two conditions: first, that the Park lands "forever shall be kept for and as a State forest and public park and for *public recreational purposes;*" and second, that they "forever shall be kept in their *natural and wild state* and as a sanctuary for wild beasts and birds ...."[7] (Emphasis added) In 1955 Governor Baxter executed a formal declaration (which was accepted by the legislature in the 1955 Interpretation Act, P. & S.L. 1955, ch. 2) designed to amplify his intent and clarify the terms of the trust. In that instrument he declared his views on the interrelationship between the two key trust conditions, as follows: "This area [the Park] is to be maintained primarily as a Wilderness and recreational purposes are to be regarded as of secondary importance and shall not encroach upon the main objective of this area which is to be 'Forever Wild.'" *Id.* The same 1955 Interpretation Act confirmed the authority of the State to build access roads in the Park, carrying out Governor Baxter's earlier decision, reflected in P. & S.L. 1949, ch. 2, to make the Park "more accessible for public use and enjoyment." That 1949 statute gave discretion to the State as trustee to build and maintain access roads as it "shall deem to be in the public interest and for the proper use and enjoyment" of the public on the condition that the roads be "constructed and maintained in a manner not to interfere with the natural wild state now existing ...." *Id.*

The Baxter State Park Authority administers the Park in accordance with the terms of the trust.[8] 12 M.R.S.A. §§ 900–907 (1981 & Supp. 1985–1986). Its membership consists of the Attorney General,

> higher areas of Mt. Katahdin and the slopes on all four sides, set a pattern that he was to follow in his succession of gifts completed in 1962. In each case he transmitted to the current governor his deed of trust which was then duly submitted to the legislature for acceptance by private and special act. In Governor Baxter's transmittal letters to the successive governors, he set forth his grand design for a state park around Maine's highest mountain. In addition to the conveyances of land, Governor Baxter in 1961 and 1965 gave the State sums in excess of $1.5 million for the care, operation, and maintenance of the Park. P. & S.L. 1961, ch. 21; P. & S.L. 1965, ch. 30.
> (Footnotes omitted)

**5.** For the deeds and acceptances, see Private and Special Laws: 1931, ch. 23; 1933, ch. 3; 1939, chs. 1, 122; 1941, chs. 1, 95; 1943, chs. 1, 91; 1945, ch. 1; 1947, ch. 1; 1949, chs. 1, 2; 1955, chs. 1, 3, 61, 171; 1963, ch. 1.

**6.** By this method of conveyance, Governor Baxter intended to create an evolving trust that reaffirmed his vision of the Park. "In this manner a long list of precedents is being established; precedents which, as time passes, will show that eight or ten different Governors and as many Legislatures, by laws duly passed and signed by *these* Governors, have entered into solemn pacts that create a succession of irrevocable trusts." Laws of Maine, 1943, p. 701. For the transmittal letters, see Laws of Maine as follows: 1931, pp. 725–26; 1933, p. 859; 1939, pp. 846–47; 1941, pp. 760–61; 1943, pp. 698–708; 1945, pp. 982–90; 1947, pp. 1244–45; 1949, pp. 1368–70; 1955, pp. 1143–50; 1963, p. 1473.

**7.** Each of the deeds and acceptances listed in note 5 above contains both conditions except that P. & S.L. 1955, chs. 61 & 171, omit the second, "forever wild" condition. Instead, both of those deeds conveyed certain lands in trust on the condition that the lands "shall forever be held for and as a State forest, public park, and public recreational purposes and for the practice of Scientific Forestry ...."

**8.** The legislature mandates that "it shall always be the purpose of the Authority to satisfy the terms of the Trust." 12 M.R.S.A. § 900 (1981). The Authority exercises "full power in the control and management" of the Park and may receive trust funds and collect fees "for maintenance and operation of the Park." 12 M.R.S.A. § 901 (Supp.1985–1986). It may promulgate rules consistent with the Administrative Procedure Act that "it deems necessary for the protection and safety of the public or for the proper observance of the conditions and restrictions expressed in the deeds of trust of the Park to the State." 12 M.R.S.A. § 903 (1981). It also exercises police powers over the Park, 12 M.R.S.A. § 905 (1981), and may hire agents to discharge its duties. 12 M.R.S.A. § 904 (1981).

the Director of the Bureau of Forestry, and the Commissioner of the Department of Inland Fisheries and Wildlife. 12 M.R.S.A. § 901 (Supp. 1985–1986). Although the Authority is an agency of the State, it operates in a manner different from any other state agency. Its members "must administer the trust like any private trustees of a charitable trust, exercising their best judgment, informed by the Attorney General's advice on any legal question and, where necessary, by instructions of a court of equity." *Fitzgerald v. Baxter State Park Authority*, 385 A.2d 189, 202 (Me. 1978).

### B. *History of Park Rule 19*

Prior to 1968, snowmobile use in the Park was unregulated. In December 1968, shortly before Governor Baxter's death, the Authority promulgated its first regulation regarding snowmobiles. That version of Rule 19 permitted use of snowmobiles on the perimeter road, some connecting service roads, and certain trails. It remained substantially unchanged for the next eight years.

In 1976 the Attorney General gave the Authority his legal opinion that the trust prohibits any and all use of snowmobiles in the Park except for administrative and emergency uses. Op.Me.Att'y.Gen. (May 20, 1976). The Authority amended Rule 19 to comply with that opinion. That rule remained in effect until 1981.

In November 1979, the Authority decided to reconsider the 1976 version of Rule 19 and voted to petition the Superior Court for instructions on several issues concerning the legality of permitting snowmobiles access to the Park. On September 11, 1980, the Authority agreed that if the Superior Court ruled that it was within the Authority's discretion to permit use of snowmobiles, it would initiate a rulemaking proceeding to establish the appropriate scope of such use in the Park. The next day the Authority filed its petition in the Superior Court.[9]

Several individuals and organizations, including the Natural Resources Council of Maine, intervened in the proceeding before the Superior Court. By stipulation of the parties, the petition was narrowed to seek a declaratory judgment on a single question that the Superior Court justice in his later opinion framed as follows:

The issue presented is whether, as a matter of law, based upon Governor Baxter's intent as expressed in the trust documents and other extrinsic evidence relating thereto, the Authority is prohibited from allowing snowmobiles in the park. This Court is not called upon to decide, nor does it purport to decide, the issue of whether snowmobile use should be permitted but only whether the intent of Governor Baxter is so clear as to permit the Court to rule as a matter of law that such use is prohibited.

The litigants amassed an impressive record, containing depositions, affidavits, a compilation of Governor Baxter's correspondence, and testimony of several witnesses, all on the Governor's intent and the effects of snowmobile use on the physical environment and on other users of the Park.

The Superior Court in June 1981 issued its declaratory judgment that the Authority "is not prohibited as a matter of law by the Baxter Park Trust from permitting the use of snowmobiles in the park for recreational purposes."[10] In reaching that conclusion,

---

**9.** The Authority's petition invoked the Superior Court's jurisdiction pursuant to the Declaratory Judgments Act, 14 M.R.S.A. §§ 5953, 5956(2), (3) (1980), and the court's equity jurisdiction pursuant to 14 M.R.S.A. § 6051(10), (13) (1980).

**10.** In a footnote hung on the word "recreational" in his declaratory judgment, the Superior Court justice explicitly defined what he meant by "the use of snowmobiles in the park for recreational purposes":

The term recreational is used herein in contrast to the administrative or emergency use of snowmobiles. The potential use discussed by the counsel in this proceeding could best be described as access by snowmobiles on the portions of the park road system.... It is not within the contemplation of any of the parties

it found that the Governor's paramount purpose in establishing the Park was to "create and preserve an area in which persons could have a wilderness experience." The Governor's secondary objective was "that the area be reasonably accessible." The court held that the use of snowmobiles promotes that trust objective of access. It also held that any access by snowmobiles is not a per se violation of the "forever wild" trust condition. Although Governor Baxter's two objectives could be accommodated, the court's opinion stressed that "[i]t is equally clear that while these dual purposes exist, the preservation of the wilderness takes priority over access ...." This declaratory judgment (hereinafter referred to as the 1981 judgment) was never appealed.

## II. *The Current Version of Rule 19*

In September 1981 the Authority initiated the rulemaking proceeding that led to adoption of the current version of Rule 19, the subject of the present appeal.[11] At a series of public hearings held in Augusta, Millinocket, Orono, and Portland, it heard testimony from representatives of the Appalachian Mountain Club, Maine Audubon Society, Maine Snowmobile Association, Natural Resources Council of Maine, and Sierra Club, as well as legislators and private citizens. It also solicited written comments and discussed the issue at an open meeting with the Park staff. On December 22, 1981, by a vote of 2–1, the Authority adopted the present Rule 19. That rule allows members of the public to travel by snowmobiles on most of the Park's perimeter road on the southern, western, and northern sides of the Park, and on the Telos cut-off road on the western edge of the Park, both roads being open to automobile use in the summertime. The rule also

that snowmobiles would be allowed to frolic at will throughout the park anymore than automobiles are permitted to do so during the summer season.

11. The Authority is authorized to promulgate rules in accordance with the Administrative Procedure Act. *See* 5 M.R.S.A. §§ 8051–8058 (1979 & Supp. 1985–1986). *See* n. 8 above.

permits travel by snowmobile on Matagamon and Webster Lakes, boundary lakes that lie only partly within the Park; and along two short stretches of the East Branch of the Penobscot River, near the Park's northerly and northeasterly boundaries. Snowmobiles are expressly excluded from the Park roads into South Branch, Kidney, and Daicey Ponds, and into Roaring Brook. All of those roads are open to automobiles in the summertime. The rule confines snowmobiles to the unplowed (i.e., traveled) portions of the perimeter and Telos cut-off roads. Everywhere else in the Park, including the vast eastern and interior areas of the Park, the use of snowmobiles is prohibited.[12] See the full text of Rule 19, n. 2 above, and the map in Appendix A.

Plaintiffs promptly sought judicial review of Rule 19 by the Superior Court. Their complaint raised three contentions. First, it tried to reopen the issue decided by the Superior Court in the 1981 proceeding, namely, whether any use of snowmobiles in the Park violates the trust. Second, it made a general attack on the design of Rule 19, asserting that the extent to which the rule permits travel by snowmobiles in the Park constitutes an abuse of discretion and violates the trust. Third, it made a specific attack on the rulemaking proceeding, contending that the rule was invalid because it was not adopted by a unanimous vote of the Authority's members. The record before the Superior Court included the evidence received in the court's prior snowmobile proceeding and the presentations to the Authority in its 1981 rulemaking proceeding. In April 1985 the Superior Court denied appellants' appeal and sustained the validity of Rule 19. It held that the 1981 judgment bars relitigation of the

12. In a lengthy "Factual and Policy Statement for Rule 19 (Snowmobiles)," the Authority set forth the evidence and rationale that support Rule 19. The Director of the Bureau of Forestry dissented and filed a separate statement.

general proposition that as a matter of law the trust does not exclude any and all use of snowmobiles in the Park; that the Authority did not abuse its discretion in promulgating Rule 19;[13] and that the Authority is empowered to exercise its rulemaking function by majority vote. The Natural Resources Council of Maine and three individual plaintiffs took timely appeals to this court.

### III. *Validity of Rule 19*

#### A. *Compliance with the Trust*

■ The central issue on appeal to this court is whether Rule 19 goes too far in allowing the use of snowmobiles in the Park. We do not consider the legal question whether *any* use of snowmobiles[14] in the Park is barred by the Baxter State Park Trust. That question was answered in the negative, once and for all, by the 1981 judgment of the Superior Court. Collateral estoppel now bars relitigation of that question.[15] Our analysis must start, therefore, from the premise that, as a matter of law, the Authority is not prohibited from promulgating a rule that allows access to the Park by snowmobiles.

■ Our analysis must also recognize that, as the 1955 Interpretation Act, P. & S.L. 1955, ch. 2, makes clear, the "forever wild" condition of the trust takes precedence over Governor Baxter's secondary goals of access and recreation. Although the wilderness purpose is superior to that of access, it does not preclude all manner of access to the Park. Reasonable access, when properly balanced with the paramount objective of preserving the wilderness experience, is a trust purpose that the Authority is charged to promote.

The Authority correctly viewed the 1981 judgment as the starting point for its rulemaking proceeding. "The [1981 judgment] concluded that these objectives [access and wilderness] are legally compatible. *Our task, as we see it, is to determine whether this is so as a practical matter, should we decide to allow snowmobiles in the Park.*" (Emphasis added) The Authority also recognized that any rule it chose to promulgate may not permit the use of snowmobiles to encroach on the wilderness experience of other users of the Park, principally cross-country skiers and snowshoers. It stated that "if there is a[n] irreconcilable conflict between the use of snowmobiles and the wilderness experience of others in the Park—if the two cannot co-exist in the 200,000 acre Park—then snowmobiles should be excluded from the Park." Within that legal framework the Authority sought to craft a rule that permits access to the Park by snowmobiles and yet preserves the wilderness experience in the Park for cross-country skiers and snowshoers.

■ The critical issue before this court is whether the manner and extent to which

---

**13.** The Superior Court erroneously stated that its review of Rule 19 was pursuant to 5 M.R.S.A. § 11007 (1979), which governs judicial review of final agency action. Agency rules, however, are to be reviewed pursuant to 5 M.R.S.A. § 8058 (1979 & Supp.1985–1986). Despite the different statutory authorization for review, the analysis is essentially the same, requiring the court to test the legal and factual basis for the agency action. *See Cumberland Farms Northern, Inc. v. Maine Milk Comm'n,* 428 A.2d 869, 873–74 (Me.1981).

**14.** *See* n. 3 above.

**15.** On appeal appellants concede that principles of collateral estoppel preclude relitigation of the issue decided by the Superior Court in the 1981 proceeding. The Authority, which pleaded, proved, and preserved its claim of collateral estoppel, invokes the doctrine as an affirmative defense against appellants on both a mutual and a nonmutual basis. Intervenor Natural Resources Council of Maine was a party to the 1981 proceeding; plaintiffs were not, although their interests were well represented by similar individual users of the Park. The key legal issue "whether the Authority is prohibited ... from permitting the use of snowmobiles within the Park for recreational purposes," was fully and fairly litigated and a final, binding judgment entered. That issue could have been reconsidered only on direct appeal from the 1981 judgment. Appellants lost that opportunity when no appeal was taken from that 1981 judgment. *See Spickler v. Flynn,* 494 A.2d 1369, 1373 (Me.1985) (per curiam); *Hossler v. Barry,* 403 A.2d 762, 766–68 (Me.1979).

Rule 19 allows snowmobiles in the Park exceeds the scope of the discretion vested in the Authority by the Baxter Trust. Judicial review of the Authority's rulemaking is governed by the Administrative Procedure Act, 5 M.R.S.A. § 8058 (1979 & Supp. 1985–1986), which provides in pertinent part:

> Insofar as the court finds that a rule was improperly adopted or exceeds the rulemaking authority of the agency, it shall declare the rule invalid. If the court finds that the rule was properly adopted and not in excess of the agency's rulemaking authority, its substantive review of that rule shall be to determine whether the rule is arbitrary, capricious, an abuse of discretion or *otherwise not in accordance with law.*

(Emphasis added) The law to be applied by this court, set forth in 12 M.R.S.A. § 903, requires that Rule 19 must be consistent with "the proper observance of the conditions and restrictions expressed in the deeds of trust of the park to the State." *See* n. 8 above. The 1981 judgment has already construed those deeds of trust to the extent of declaring that they do not as a matter of law bar wintertime access to the Park by snowmobiles.

The Authority took special care to explain the factual basis and rationale of Rule 19. Based on an exhaustive review of all the evidence assembled in the 1981 Superior Court case and during the subsequent agency rulemaking proceeding, the Authority reached three conclusions. First, it determined that the Park should be accessible in winter and that snowmobiles provide a reasonable method of winter access. That finding was grounded on the testimony of the snowmobile proponents to the effect that to allow snowmobiling would increase the recreational use of the Park; that it would enable some citizens to visit the Park who otherwise would be denied access in the wintertime; that modern snowmobiles are quieter than earlier models; and that snowmobilers are courteous *to other* users of the same trails. In sum, evidence of record demonstrates that Rule 19 promotes the trust objective of access and recreation in the Park. Second, the Authority found that "the use of snowmobiles on the perimeter road will [not] adversely affect wildlife or otherwise affect the physical status of the Park," a finding that is not challenged on appeal to this court.

■ The critical decision, then, turned on the Authority's judgment as to the manner and extent to which the use of snowmobiles should be allowed in order to promote access without encroaching upon the primary goal of preserving the wilderness experience. Snowmobile opponents testified before the Authority to the effect that the use of snowmobiles would deprive them of the wilderness experience they seek in the Park. Because the nature of a "wilderness experience" is highly subjective, the Authority accorded special respect to those views. "We acept the heartfelt testimony and letters from cross-country skiers and snowshoers that snowmobiles would infringe upon their wilderness experience in the Park. Governor Baxter ... intended to make the Park accessible, but the access he intended was for the paramount purpose of providing a wilderness experience." The Authority concluded, however, that the Park could accommodate diverse winter activities and that by strictly confining snowmobiles, principally to the perimeter road, the wilderness experience could be preserved for cross-country skiers and snowshoers. Upon reviewing those conclusions, the Superior Court held:

> By thus giving preservation of the wilderness experience priority over enhanced access during the winter months, the Authority stayed within the boundaries [of] its discretion as the trustee of the Park. By permitting restricted recreational snowmobile use, Rule 19 greatly enhances the Park's accessibility in the wintertime without unduly infringing on the wilderness experience of other, nonmechanized users of the Park.

We accord no special deference to that ruling of the Superior Court, sitting as it was as only an intermediate appellate tribunal. Instead we review Rule 19 independently in light of the record before the Authority. *See Gulick v. Board of Environmental Protection*, 452 A.2d 1201, 1209 n. 6 (Me.1982). Nonetheless, we come to the same conclusion as the Superior Court.

▇ Rule 19 represents a rational accommodation between the dual goals of the Baxter State Park Trust. Because the rule subordinates the objective of wintertime access by snowmobiles to Governor Baxter's predominant purpose of wilderness preservation, it is consistent with the terms and purposes of the trust. Nothing in this record causes us to second-guess the judgment of the Authority. Rule 19 strictly limits the use that may be made of snowmobiles for wintertime access to the Park. It confines use of snowmobiles principally to the perimeter road. By contrast, use of automobiles in the summertime is permitted not only on the perimeter road but also on several other roads of the Park.

Rule 19, while enhancing wintertime access to the Park, at the same time protects the public's opportunity to enjoy the wilderness experience. It entirely prohibits snowmobile use in the vast eastern and interior two thirds of the Park. That area, the Authority found, is the part of the Park favored by cross-country skiers and snowshoers seeking a wilderness experience.[16] "Once the skiers and the snowshoers leave the perimeter road," the Authority concluded, "they will not hear, see or smell any snowmobiles. This group, then, will have access to the vast interior of the Park, including the roads and trails most popular for skiing and snowshoeing, with no infringement upon their wilderness experience." In designing Rule 19 the Authority succeeded in preserving the wilderness experience that Governor Baxter intended to protect as the primary objective of the trust.

Governor Baxter could not be expected to have fully anticipated the exact nature of the conflicts between his wilderness and access goals that are presented by such facts of present-day life as the use of snowmobiles.[17] With customary wisdom he left it to the Authority to accommodate his twin objectives in the face of such conflicts. The Governor vested the Authority with the responsibility of exercising its best judgment in working out conflicts with solutions that promote both objectives of the trust, but gives priority to Governor Baxter's goal of maintaining the Park "forever wild."

The importance of the task that Governor Baxter committed to the Authority's judgment is shown by the keen interest he took in the composition of the Authority's membership. *See generally* Op.Me.Att'y Gen. 83–46. "The membership in the Authority, obviously selected by Governor Baxter himself and ratified by him by his subsequent gifts, consists of the State's principal officers in the professions of the law, forestry, and fish and wildlife management. Both Governor Baxter and the Legislature placed their confidence in the judg-

---

16. The Authority explained the basis of this finding as follows:

We heard testimony that, for the most part, cross-country skiers and snowshoers enter the Park from the Togue Pond gate at the southern end of the Park, and then travel to Roaring Brook, then Russell Pond, and on to South Branch Pond or enter from the north at the Matagamon Gate and travel down through South Branch Pond.... [E]xcept for the short distances on the perimeter road between the Togue Pond gate and the Roaring Brook Road in the south and the Trout Brook crossing and the Matagmon Gate in the north, there will be a total separation of uses between snowmobiles, and cross-country skiers or otherwise with the rule we adopt.

17. Prior to his death in 1969, Governor Baxter in a 1965 letter to Helen Taylor wrote the following in regard to "Motor Skis": "I would be much pleased if the AUTHORITY would add this to the list of what is forbidden in the regulations." As the Superior Court in its opinion accompanying the 1981 judgment stated, "While the [1965] letter expresses the settlor's then current view of snowmobiles, it also acknowledges the power of the Authority to regulate their use."

ment and integrity of those high state officials." *Fitzgerald v. Baxter Park Authority*, 385 A.2d at 202–03. In discharging their duties, the members of the Authority often have to grapple with issues such as the snowmobile controversy that the trust does not resolve or that require application of specialized and technical expertise. Those situations require the Authority to exercise its best judgment, informed by its own careful study of the documentary evidence and by court decision and public comment, in order to discern and implement Governor Baxter's vision for the Park. Thus, "even though the Baxter trust is not a discretionary one, the expert judgment of members of the Park Authority ... should generally be accorded great weight in choice of methods for carrying out the donor's intent." *Id.* at 202. In the case at bar there is no legal justification for disturbing the in-depth study and expert judgment of the Authority in defining the appropriate use of snowmobiles in the Park. Rule 19 represents a permissible exercise of judgment by the Authority.

■ Of the many questions that the Authority addressed in promulgating Rule 19, appellants single out for special attention the issue whether Rule 19's restrictions on snowmobiling are enforceable. On appeal they contend that Rule 19 is fatally defective because some snowmobilers may use the perimeter road and the Telos cut-off merely as an easy way to get from one side of the Park to the other. All parties agree that Governor Baxter intended the Park to be a destination rather than a detour or shortcut. The Authority recognized the thoroughfare problem but found no evidence to portend significant violation of the rule. It concluded "that there is no legitimate basis for assuming that snowmobile[r]s will abuse the rule any more than others [i.e., motorists] do ...." Appellants properly point out that the fact that some automobiles may use the Park as a summertime thoroughfare cannot save Rule 19. There is no evidence, however, that in the time Rule 19 has been in effect, snowmo-

biles have used the Park's perimeter road as a mere thoroughfare. The Authority committed itself to monitoring the rule and can be expected to address by appropriate measures any significant problems that may arise.[18] In the meantime, the speculative possibility of abuse of Rule 19 does not invalidate it.

### B. *Validity of the Authority's Majority Vote*

■ The statute governing composition of the Authority, 12 M.R.S.A. § 901, provides in part: "[The Park] shall be under the *joint supervision and control* of, and shall be administered by the Director of the Bureau of Forestry, the Commissioner of Inland Fisheries and Wildlife and the Attorney General." (Emphasis added) Appellants urge that "joint supervision and control" means that the Authority cannot take any action, such as adopting a rule, unless all of its members agree. To support their argument they point, however, only to the adjective "joint," and do not offer any persuasive rationale for that interpretation.

The legislature has enacted rules of construction that expressly define the requirements of decisionmaking by three or more persons in legislatively created commissions and similar bodies. "Words giving authority to 3 or more persons *authorize a majority to act,* when the enactment does not otherwise provide." 1 M.R.S.A. § 71(3) (1979) (emphasis added). The term "joint supervision and control" does "not otherwise provide"; it merely declares that all three heads of the relevant state agencies shall participate in voting on questions of the supervision and control of the Park. If the legislature meant to require unanimity in such voting, contrary to the statutory canon of construction, it easily could have so provided. Instead, it directed the three-member Authority to promulgate rules in accordance with the Administrative Procedure Act, exactly the same as any other multi-member state board. *See* n. 8 above. Nothing in that act can be construed to

---

**18.** The Authority warned that it will not tolerate violation of the rule. "If we discover that the rule is not being obeyed, we will change it to exclude snowmobiles."

require a unanimous vote for the valid promulgation of a rule by a state agency.

The entry is:

Judgment affirmed.

NICHOLS, ROBERTS, and GLASSMAN, JJ., concurring.

APPENDIX A

The heavy, unbroken black lines indicate the roads and other areas where use of snowmobiles is permitted under Rule 19 of the Baxter State Park Authority. See n. 2 above for full text of Rule 19.

# BAXTER STATE PARK

SCOLNIK, Justice, dissenting.

I respectfully dissent. In my view, recreational snowmobiling as permitted by Rule 19 is antithetical to the trust's paramount purpose of preserving the wilderness experience.

The Court concludes that since the use of snowmobiles enhances access to the Park, such use does not offend, but is compatible with, the terms of the trust. This analysis misframes the issue. The issue in this case, as both the Authority and the Superior Court perceived it, is not whether snowmobiling as a means of wintertime access to Baxter Park is permissible under the trust, but whether snowmobiling for *recreational purposes* may be so permitted.

The history of Rule 19 plainly demonstrates that the rule was not intended to promote access but is designed expressly to allow recreational snowmobiling. In December, 1968, the Authority officially sanctioned the use of snowmobiles for recreational purposes when it promulgated the first version of Rule 19. Prior to 1968, the use of snowmobiles in Baxter Park was unregulated and recreational snowmobiling was therefore not prohibited. In 1976, after the Attorney General rendered his opinion that the terms of the trust prohibited the recreational use of snowmobiles, the Authority amended the rule to prohibit

such use. In November, 1979, after the Maine Snowmobile Association proposed reconsideration of the ban, the Authority instituted a complaint for declaratory judgment seeking guidance concerning the legality of permitting snowmobiles in the Park for recreational purposes. The Authority agreed that if the Superior Court ruled that the trust did not prohibit recreational snowmobiling, it would promulgate a rule establishing the extent to which the use of snowmobiles for recreational purposes would be allowed in Baxter Park.

The sole issue presented to the Superior Court was whether, as a matter of law, "the Authority [was] prohibited...from permitting the use of snowmobiles within the park for recreational purposes." In 1981, the Superior Court answered the question by concluding that the terms of the trust did not *per se* bar recreational snowmobiling.[1]

Following that decision, the Authority initiated a rulemaking proceeding for a "proposed rule for the *recreational use of snowmobiles in the Park.*" (emphasis added). The Authority understood its task to be the fashioning of a rule that would permit the recreational use of snowmobiles but would not, "in actual practice," "conflict" with the wilderness concept embodied in the trust. It accomplished that goal by

1. Because the machines were not invented at the time the trust instruments were drafted, the court found its terms ambiguous with respect to recreational snowmobiling and therefore considered extrinsic evidence of Governor Baxter's subsequent expressions to determine his intent at the time he created the trust. One item of evidence considered was a letter from the Governor to Helen Taylor, Park Supervisor, dated May 11, 1965, in which he discussed snowmobile use in the Park. He wrote:

In regard to the Motor Skis I have thought this over and have this suggestion to make. These skis should be prohibited in the Park except for the one for you as Supervisor to use in cases of emergencies. I feel strongly about this for they will frighten away the wild animals and we certainly would not see a caribou again. This same reason prompted us to forbid the use of motor boats in our lakes. I can see the damage they would cause.

I would be much pleased if the AUTHORITY would add this to the list of what is forbidden in the regulations. Will you please bring this to the attention of the AUTHORITY members for this is the time to kill it.

The Superior Court justice stated that the letter was "not dispositive of [the] issue" and "reflect[ed] the ambiguity which exists within the trust." The justice further concluded that "[h]ad Governor Baxter believed that the intent of the trust agreement clearly prohibited the use of snowmobiles within the park, he certainly would not have requested that his views on the matter be brought to the Authority's attention."

As explained in the above letter, Governor Baxter's similar objection to the use of motor boats prompted the Authority to ban their use. On April 18, 1966, the Governor also wrote a letter to the Authority expressing his concern about the use of motorcycles. They too were excluded by the Authority soon thereafter.

promulgating Rule 19. The rule essentially divides the Park into two unequal sections, one for the recreational use of snowmobiles, the other for those who rely on non-mechanical modes of recreation such as cross-country skiing and snowshoeing. Recreational snowmobile use is basically restricted to the Perimeter Road and certain spurs in the western, northern and eastern portions of the Park and to two larger lakes in the western section of the Park, while other winter non-mechanized recreational uses are confined to the eastern and interior two thirds of the Park. Thus, as explained by the Authority, the rule effects a *"total separation"* of uses between snowmobiles, and cross-country skiers [or snowshoers]...." (emphasis added).

The plaintiffs sought judicial review of Rule 19 contending, *inter alia,* that the rule violates the terms of the trust because of the extent to which it permits the recreational use of snowmobiles. The Superior Court, in this proceeding, held that the recreational use of snowmobiles permitted by the rule was "compatible" with the trust because, by completely separating the con-

flicting recreational uses, the rule did not "unduly infrin[ge]" on the wilderness experience.[2] Hence, both the Authority and the Superior Court determined that since the rule separates the two conflicting uses, the recreational use of snowmobiles did not unduly detract from the wilderness experience of others who are "willing to walk" because they would not be in that section of the Park where their wilderness experience would be diminished.

Accordingly, the history of Rule 19 makes clear that the issue before us has little to do with the use of snowmobiles as a means of access to the Park. Despite the fact that snowmobile use, like many other forms of mechanized recreational devices, may simultaneously facilitate access, it cannot be ignored that the purpose of the rule is to permit recreational snowmobiling. Therefore, the issue that must be addressed, as I see it, and as both the Authority and the Superior Court perceived it, is whether the recreational use of snowmobiles permitted under Rule 19 comports with the terms of the trust.[3] In my opinion, it obviously does not.

**2.** The court's conclusion was based on the fact that Rule 19 created a "total separation" between the two recreational activities that could not otherwise co-exist. The Superior Court justice stated: "[T]he Authority could not reasonably have concluded that the recreational use of snowmobiles would not deter skiiers (sic) and snowshoers from using the Park, or detract from the wilderness experience of those who continued to use it."

**3.** I thus strongly disagree with the Court's analysis of the issue as if it were merely a balancing between promoting access and preserving the wilderness experience. Such an analysis is premised on the assumption that since the Governor permitted the use of automobiles as a means of access in the summertime, a similar exception to the wilderness mandate can be inferred to permit the use of snowmobiles in the Park in the wintertime. This analysis is wrong for several reasons. First, the entire history of Rule 19 makes clear that the primary objective of snowmobile use is the enjoyment of the ride itself, rather than a means of transportation to facilitate access to the Park to use and enjoy the wilderness "in the right unspoiled manner." *Unlike* the use of automobiles in the Park, recreational snowmobiling is more akin to other

forms of mechanized recreation such as all-terrain-vehicles and trail bikes. This fact was recognized by the Superior Court in the 1981 decision. The justice in that case stated: "It is probably accurate to refer to [snowmobile] use as recreational *since the vehicles themselves are considered to be recreational."* (emphasis added). Second, the Court's analysis ignores the reluctance the Governor expressed when he decided in 1949 to allow automobiles in the Park for access purposes. He explained that his decision represented "a considerable concession" on his part. This decision should not be construed as signaling an abandonment of the Governor's intent to preserve the Park for those who are "willing to walk and make an effort to get close to nature," nor does it support the assumption that the Governor would have enlarged his "concession" to permit snowmobiles in the Park. Finally, just as the Governor obviously did not intend that the entire area of the Park be accessible by automobile, he did not intend that the Park be equally accessible at all times of the year. He knew his concession for automobile use was limited to the summertime because the roads are impassible in the wintertime. Corroborating his recognition that wintertime access would be more limited, he postponed to spring-

The trust evolved over time to reflect Governor Baxter's intent as embodied in his deeds and transmittal letters. The two conditions in the deeds provide that the Park lands "forever shall be kept for and as a State forest and public park and for public recreational purposes" and that they "forever shall be kept in their natural and wild state and as a sanctuary for wild beasts and birds...." In 1971, the State of Maine reiterated these concerns in the statement of purpose of Baxter Park. P.L. 1971, ch. 477, § 1. That statement, relying primarily on Governor Baxter's own words, interpreted the terms "public park," "recreation," "natural wild state" and "sanctuary for wild beasts and birds." It states, in part:

> Lest those that follow, uncertain of Governor Baxter's wishes, seek to define his desires in ways inharmonious with their original intent, this section is enacted.
>
> It shall be the object of the Baxter State Park Authority to preserve the grandeur and beauty of Maine's highest peak, Mount Katahdin, as well as the 45 other mountains, the numerous lakes, ponds and streams; to subordinate its own wishes to the intent of Governor Baxter; to recognize his wish that, in this era of change, one thing of natural beauty remain constant.
>
> This intent must be interpreted so as not to separate this park from the people to whom it was given; but rather seek to have it enjoyed and "used to the fullest extent but in the right unspoiled manner."
>
> As a public forest it shall remain in its natural wild state and when "the Forests of our State have been cut off and disappeared, when civilization has encroached upon the land we now refer to as 'Wild Land,' this park will give the people of succeeding generations a living example of what the State of Maine was 'in the

good old days' before the song of the woodsman's axe and the whine of the power saw was heard in the land."

> As a public park and a place of recreation, it is apparent that it is intended for "those persons who enjoy the wilderness" and that *the repeated use of the word "recreation" refers to the use of this park compatible with its natural state as a wilderness area and an expanse "for those who love nature and who are willing to walk and make an effort to get close to nature* ... with pleasant foottrails built and attractive campsites laid out in the valleys, by the brooks, and on the shores of the water."

> As a tract kept in its "natural wild state," it is intended that "everything in connection with the park must be left simple and natural and must remain as nearly as possible as it was when only the Indians and the animals roamed at will through these areas..." Access to the park shall be provided only "as may be necessary to accommodate those persons who wish to enjoy the great unspoiled area that now is the property of our State..."

> ....

> "While I am living I fear no encroachments on the park, but as time passes and new men appear upon the scene, there may be a tendency to overlook these restrictions and thus break the spirit of these gifts."

12 M.R.S.A. § 900 (emphasis added).

Governor Baxter also executed a formal declaration designed to clarify his intent as embodied in the terms of the trust, which was accepted by the Legislature in the 1955 Interpretation Act, P. & S.L. 1955, ch. 2. The Governor stated in that declaration:

> This area [the Park] is to be maintained primarily as a Wilderness and *recreational purposes are to be regarded as of secondary importance and shall not*

---

time his own visit to the Park expressing the view that in the wintertime, the Park is best left "to the wild animals who enjoy the peace and solitude therein." Accordingly, any attempt to

equate the use of snowmobiles to automobile use, to which Governor Baxter made an express but reluctant concession, is clearly unfounded.

*encroach upon the main objective of this area which is to be 'Forever Wild'. Id.* (emphasis added).

The above provisions illustrate that there are two alternative standards that must be met in order for the rule to be declared valid. First, as a recreational activity, the permitted recreational snowmobiling must be "compatible with [the Park's] natural state as a wilderness area and an expanse 'for those who love nature and who are willing to walk and make an effort to get close to nature.'" Second, the recreational snowmobiling permitted by the rule must not "encroach upon the main objective" of maintaining the Park in its natural state. For all practical purposes, these standards mean basically the same thing. They require that any recreational activity permitted in the Park must be harmonious with, and not encroach on, the trust's primary objective of preserving the wilderness experience.[4]

The Authority's own conclusion—that the conflicting recreational uses of snowmobiles and non-mechanized modes of recreation cannot be accommodated except by total physical separation—shows that the extent of recreational snowmobiling permitted by the rule violates the standard set forth in the trust. If the permitted snowmobile use cannot co-exist with the use of the Park by those who are "willing to walk" to enjoy the wilderness in "the right unspoiled manner," it certainly cannot be harmonious with or avoid encroaching on the wilderness experience. This fact was plainly recognized in this case by the Superior Court justice who, in reviewing the validity of Rule 19, stated:

> It cannot be seriously argued that snowmobile riding itself is part of the "wilderness experience" as Governor Baxter contemplated it. Governor Baxter's description of the experience as a primitive, one-to-one encounter between man and the elements on nature's terms is antithetical to the sort of man-machine experience one has while snowmobiling.

Both the Authority and this Court assume that recreational snowmobiling can nevertheless be made compatible with the wilderness experience. This is achieved by "totally separating" the use of snowmobiles from those users of the Park who engage in recreational activities that do not spoil the wilderness experience. Such an assumption is flagrantly at odds with the trust. No provision in the trust allows for carving the Park into two zones in order to segregate recreational activities. To the contrary, the trust terms are quite clear that *all* recreational uses that occur anywhere in the Park must be harmonious with the wilderness experience. If the Governor's goal of maintaining that experi-

---

**4.** Governor Baxter felt strongly about the need to preserve the wilderness experience in modern society. In a letter to Robert Marshall, dated May 4, 1937, the Governor expressed his full agreement with Marshall's discussion of the value of the wilderness experience that had been published in a magazine. The magazine article stated:

> [We] can afford to sacrifice almost any other value for the sake of retaining something of the primitive.... To countless people the wilderness provides the ultimate delight because it combines the thrills of jeopardy and beauty. It is the last stand for that glorious adventure into the physically unknown that was commonplace in the lives of our ancestors and has always constituted a major factor in the happiness of many exploratory souls. It is also the perfect esthetic experience because it appeals to all of the senses.... It is all of these at the same time, blended into a unity that can only be appreciated with leisure and which is ruined by artificiality.... Quality as well as quantity must enter into any evaluation of competing types of recreation, because one really deep experience may be worth an infinite number of ordinary experiences. Therefore, it is preposterous to hold that the objective of outdoor recreational planning should be to enable the maximum number of people to enjoy every beautiful bit of the outdoors.
>
> All the while year after year, the United States becomes more and more mechanized. The life of one person after another has been saturated by machinery. Human beings require compensations and it seems inevitable that as the machine age expands the need for an escape will also expand.

Marshall, "The Universe of the Wilderness Is Vanishing," *Nature Magazine*, April 1937.

ence for present and future generations is to have any meaning, the focus cannot be on whether human beings are actually present or not, but it must be on whether there is any diminution in the wilderness character of the Park or the solitude available to be experienced therein. In expressing his antipathy to any activity that might encroach on the wilderness condition, the Governor explained:

Katahdin should and must remain the wild, storm-swept, untouched by man region it now is: that is its great charm...a place where nature rules and where the creatures of the forest hold undisputed dominion. As modern civilization with its trailers and hot dog stands, its radio and jazz, encroaches on the Maine wilderness, the time yet may come when only the Katahdin region remains undefiled by man. If Maine or the National Government wishes to provide resorts for winter and summer sports, there are ample opportunities available elsewhere in Maine....[5]

The preservation of the wilderness experience envisioned by Governor Baxter does not depend on the actual presence of people. It is to be preserved, instead, by preventing any encroachment that threatens the wilderness state without which no wilderness experience is possible. It is inconceivable that the sound and smell from the operation of snowmobiles on Matagamon and Webster Lakes would not encroach on Governor Baxter's goal of maintaining the Park as a place to enjoy the wilderness as " ' "in the good old days" before...the whine of the power saw was heard in the land' " merely because others seeking the kind of wilderness experience contemplated by Governor Baxter are not physically in a particular area. Since it is evident that the recreational snowmobiling permitted by the rule cannot be reconciled with the wilderness state, the rule should be declared invalid. The trust requires nothing less.

Thus, although the issue presented in this case differs from the issue raised in

the 1981 Superior Court decision, the above analysis of the validity of Rule 19 leads to the inevitable conclusion that the 1981 decision is incorrect. Ordinarily, rules of issue preclusion would require that we not disturb that Superior Court decision. However, an exception to the principle of collateral estoppel has been recognized in cases where private litigation has a "potential adverse impact" on the public interest. *Restatement (Second) of Judgments* § 28(5)(a) (1982). In such cases, protection of the public interest authorizes the correction of an erroneous judgment. This recognized exception is particularly applicable here because, unlike the 1981 declaratory judgment action that was decided in a more narrow context, the matter before us involves an examination of a specific regulation and provides a factual record, including testimonial evidence, that deals directly with the proposed rule. It cannot be disputed that the public would be adversely affected if an incorrect interpretation of the trust is permitted to stand. Over a period of thirty-one years, the Governor acquired over 200,000 acres of land for the purpose of preserving the wilderness experience. He conveyed this land in trust for the benefit of the people of Maine. Hence, a decision of this Court that would perpetuate the 1981 Superior Court decision, would not only adversely affect the parties of record, but also the populace at large for whom the trust was created. The facts in this case demonstrate that the 1981 decision is untenable. In these circumstances, this Court, under the *Restatement* exception, need not consider itself bound by principles of collateral estoppel when the consequence of such a restraint is the frustration of Governor Baxter's clearly expressed purpose of creating the Park as a refuge against the encroachments of mechanized society to the prejudice of the trust beneficiaries, the people of the State of Maine.

Accordingly, I would vacate the judgment of the Superior Court and remand with instructions to declare Rule 19 to be

---

5. Portland Press Herald, May 3, 1937.

invalid because the extent of recreational use of snowmobiles permitted by the rule violates the mandates of the trust.